**OIL, CHEMICAL AND ATOMIC WORKERS INTERNATIONAL UNION, AFL-CIO, LOCAL 2-286, Plaintiff-Appellee,**

v.

**AMOCO OIL COMPANY (SALT LAKE CITY REFINERY), Defendant-Appellant.**

No. 86-2838.

United States Court of Appeals, Tenth Circuit.

Sept. 15, 1989.

Rehearing Denied Nov. 21, 1989.

---

Arthur F. Sandack, Sandack & Sandack, Salt Lake City, Utah, for plaintiff-appellee.

Robert M. O'Connell, Chamberlain, Hrdlicka, White, Johnson & Williams, Houston, Tex., for defendant-appellant.

Before LOGAN, SEYMOUR, and BALDOCK, Circuit Judges.

SEYMOUR, Circuit Judge.

Local 2–286 of the Oil, Chemical and Atomic Workers International Union, AFL–CIO filed suit for declaratory and injunctive relief against Amoco Oil Company pursuant to section 301 of the Labor Management and Relations Act, 29 U.S.C. § 185 (1982) (LMRA). The Union sought to enjoin Amoco's implementation of a drug testing program at its Salt Lake City refinery pending the outcome of arbitration over Amoco's right, under the parties' Collective Bargaining Agreement, to unilaterally impose the testing program. The district court granted the requested relief and Amoco appeals. We affirm.

## I.

Amoco has operated its Salt Lake City refinery for over seventy years, and has had a collective bargaining relationship with the Union for approximately forty years. The Agreement in force at the time the Union filed this suit contains broad grievance and arbitration provisions,[1] as well as a management rights clause.[2] Article 21 of the Agreement, which addresses health and safety issues, establishes a joint labor-management committee for "the purpose of considering, inspecting, investigating and reviewing health and safety conditions and practices." Rec., vol. I, doc. 1, Ex. A at 55. The committee is responsible for making constructive recommendations "including but not limited to the implementation of corrective measures to eliminate unhealthy and unsafe conditions and prac-

tices and to improve existing health and safety conditions and practices." Id. Article 21 further provides that Amoco shall continue "its existing industrial hygiene program," id. at 56, and that Amoco shall pay for physical and medical tests "at a frequency and extent determined ... by the joint committee." Id. at 54. Finally, Article 21 specifies that "[a]ny dispute arising with respect to the interpretation or application" of its provisions is subject to the Agreement's grievance and arbitration procedures. Id. at 56.

In May 1986, Amoco notified the Union that it wanted to implement a drug testing program at the Salt Lake City refinery. The Union objected to Amoco's proposal and responded with a counterproposal, but four months of negotiations failed to produce agreement about the nature and scope of the proposed testing program. Amoco therefore decided to implement a drug testing program unilaterally, and notified its employees by letter dated September 12, 1986, that it intended to do so thirty days hence.[3] In broad outline, the program requires an annual test for those "[e]mployees who, by the nature of their job, could pose an immediate safety risk to themselves, fellow employees, property, and/or the general public if working under the influence of drugs or alcohol." Rec., vol. I, doc. 1, Ex. B. The program also provides for the random testing of any employee "who, in the judgment of management may be working under the influence of drugs and alcohol or whose work performance is

1. The grievance procedure is set forth at Article 16 of the Agreement. It permits "any employee or group [that] believes himself or themselves to have been injured or treated unfairly in the application of any term of the Agreement" to seek redress by means of a three-step process ultimately leading to arbitration if the dispute is "arbitrable under the terms of Article 17." Addendum to Appellant's Brief, doc. 2, Articles of Agreement, at 45–46.

 Article 17, the arbitration provision, provides in pertinent part that

 "[i]f there is a dispute over the proper interpretation or application of this Agreement, which the Union has been unable to adjust to its satisfaction through its use of the grievance procedure set forth in Section 16.3, the Union may, within the specified time limits,

demand in writing that the dispute be decided by arbitration."
Id. at 47.

2. Article 14 of the Agreement, "Rights of Management," provides that

 "[e]xcept as expressly limited by this Agreement, the management and direction of the Company is the prerogative of the Company. This includes, but is not limited to, the right to hire and assign employees, apply discipline, demote or discharge employees for cause, and determine the size of the working force."
Id. at 43.

3. The starting date for testing was postponed until October 23, because employees did not timely receive the notification letters.

being adversely affected by the abuse of drugs and alcohol." *Id.*

The Union filed a written grievance objecting to Amoco's unilateral implementation of the new program. The grievance alleged that Amoco's action violated various provisions of the Agreement, including Article 21, and it requested that the company postpone implementation of the program pending resolution of the grievance. Notwithstanding the Union's request, Amoco implemented the policy, and ultimately denied the grievance. The Union then filed this action for a temporary restraining order and a preliminary injunction, and the district court ordered Amoco to show cause why a restraining order should not issue.

At a hearing during which the district court heard testimony and received evidence, both sides agreed that the underlying dispute was arbitrable and acknowledged that they were proceeding to arbitration as called for by their Agreement. They also agreed in large measure on the applicable law. They disagreed, however, on the application of the governing law to the instant case. Amoco argued that an injunction is precluded by the jurisdictional limitations on the issuance of injunctions imposed by the Norris–LaGuardia Act, 29 U.S.C. §§ 101–115 (1982). Amoco further contended that the case falls outside the exception to Norris–LaGuardia set forth in *Boys Markets v. Retail Clerks Union,* 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), and refined in *Buffalo Forge v. United Steelworkers of America, AFL–CIO,* 428 U.S.. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976), construing those cases as holding that injunctive relief is precluded by the Act if a dispute can be resolved through arbitration and the parties are proceeding with arbitration. Amoco acknowledged that courts may properly enjoin employer actions which threaten the arbitral process, but argued that implementation of the testing program would not make arbitration a "hollow formality" by irreparably injuring the Union's employees. The Union vigorously disagreed with these contentions.

Based on the evidence before it, the district court concluded that the *Boys Markets* exception was applicable because Amoco's action threatened the integrity of the arbitral process and equitable principles favored issuance of a status quo injunction. The court specifically found that the Union employees would suffer irreparable injury absent a status quo injunction because they potentially would be "humiliated," "frustrated," "stigmatized," and "embarrassed" by the testing program. Rec., vol. III, at 159. The court concluded that the Union's position was sufficiently sound to prevent arbitration from being a futile endeavor, and hence that the Union had satisfied the criterion of likelihood of success on the merits. The court also determined that the balance of harms favored issuance of an injunction and that the public interest would be served by a status quo injunction. Consequently, the court enjoined Amoco from implementing its drug testing program pending the outcome of arbitration.

Amoco raises essentially the same arguments on appeal. Its primary contention is that the district court lacked jurisdiction to issue an injunction because the case does not fit the *Boys Markets* exception to the Norris–LaGuardia Act. Amoco also asserts that the district court's finding of irreparable injury is neither legally sufficient to justify the injunction in this case, nor supported by the record. Finally, Amoco challenges the court's assessment that the public interest favors issuance of the injunction.

## II.

■ Amoco's jurisdictional challenge presents us with a question of first impression in this circuit: whether *Boys Markets* injunctions may issue to enjoin *employer* breaches of collective bargaining agreements, and if so, under what circumstances. Our inquiry does not proceed through uncharted terrain, however. A majority of circuits have addressed these issues and have established helpful and, for the most part, well-settled reference points. *See, e.g., Aluminum Workers Int'l v. Consol-*

*idated Aluminum Corp.,* 696 F.2d 437 (6th Cir.1982); *Local Lodge No. 1266 v. Panoramic Corp.,* 668 F.2d 276 (7th Cir.1981); *United Steelworkers v. Fort Pitt Steel Casting,* 598 F.2d 1273 (3d Cir.1979); *Amalgamated Transit Union, Div. 1384 v. Greyhound Lines, Inc.,* 529 F.2d 1073 (9th Cir.) *(Greyhound I ), vacated and remanded,* 429 U.S. 807, 97 S.Ct. 43, 50 L.Ed.2d 68 (1976), *rev'd,* 550 F.2d 1237 (9th Cir.1977) *(Greyhound II ), cert. denied,* 434 U.S. 837, 98 S.Ct. 127, 54 L.Ed.2d 99 (1977); *Lever Bros. Co. v. International Chemical Workers Union, Local 217,* 554 F.2d 115 (4th Cir.1976); *Hoh v. Pepsico,* 491 F.2d 556 (2d Cir.1974).

Understanding the role of the judiciary and the proper use of injunctions in resolving labor disputes governed by collective bargaining agreements requires the consideration of several fundamental policies embedded in our national labor laws. The peaceful resolution of labor disputes through voluntary arbitration constitutes the overarching concern of national labor policy. Indeed, "[t]here is no more fundamental policy in our national labor laws." *Consolidated Aluminum,* 696 F.2d at 441. *See, e.g.,* 29 U.S.C. 173(d) (1982); *Nolde Brothers, Inc. v. Local 358, Bakery & Confectionery Workers,* 430 U.S. 243, 253, 255, 97 S.Ct. 1067, 1073, 1074, 51 L.Ed.2d 300 (1977); *Steelworkers Trilogy (United Steelworkers v. American Manufacturing Co.,* 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers v. Enterprise . Wheel & Car Corp.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960)).

Both the Labor Management Relations Act and the Norris–LaGuardia Act contribute to the advancement of this policy. Section 301(a) of the LMRA grants district courts jurisdiction to enforce, "contracts between an employer and a labor organization representing employees in an industry affecting commerce...." 29 U.S.C. § 185(a). This jurisdictional grant permits federal judicial enforcement of collective bargaining agreements and thereby encourages their use. *See Boys Markets,* 398 U.S. at 242, 245, 90 S.Ct. at 1588, 1589. The Norris–LaGuardia Act broadly prohibits the issuance of injunctions in labor disputes. Its policy against judicial interference in such disputes, *see Boys Markets,* 398 U.S. at 252, 90 S.Ct. at 1593; *Buffalo Forge,* 428 U.S. at 410–11, 96 S.Ct. at 3149; *Jacksonville Bulk Terminals, Inc. v. International Longshoremen's Ass'n,* 457 U.S. 702, 707–21, 102 S.Ct. 2672, 2677–85, 73 L.Ed.2d 327 (1982), is rooted in a concern for "foster[ing] the growth and viability of labor organizations," *Boys Markets,* 398 U.S. at 252, 90 S.Ct. at 1593, but it also encourages parties to work out their differences without judicial involvement. *See Consolidated Aluminum,* 696 F.2d at 441.

Although each in its own way promotes the peaceful resolution of labor disputes through voluntary arbitration, the jurisdictional grant of the LMRA and the jurisdictional limitations of Norris–LaGuardia often conflict. The accommodation of these conflicting policies has been left to the courts. *Boys Markets,* 398 U.S. at 251, 90 S.Ct. at 1592. The Supreme Court has created a broad framework to guide lower courts in assessing how best to accommodate these interests when they conflict. In *Boys Markets,* the Court recognized an exception to the anti-injunction provisions of Norris–LaGuardia when an *employer* brings suit under section 301(a) of the LMRA *to enforce a union's* contractual obligation to arbitrate grievances rather than strike over them. The exception was necessary because the "unavailability of equitable relief in the arbitration context present[ed] a serious impediment to the congressional policy favoring the voluntary establishment of a mechanism for the peaceful resolution of labor disputes...." *Boys Markets,* 398 U.S. at 253, 90 S.Ct. at 1593–94.

Six years later, the Court in *Buffalo Forge* refined the holding of *Boys Markets* by clarifying that it applied only to those situations in which the labor dispute precipitating the strike is subject to arbitration. The Court emphasized that the rationale underlying *Boys Markets* was to protect

the arbitral process from being frustrated and to ensure that the parties honored their bargains. *Buffalo Forge*, 428 U.S. at 407, 96 S.Ct. at 3147. This rationale does not apply, the Court reasoned, when the underlying dispute is not subject to mandatory arbitration procedures, for then a "strike ha[s] neither the purpose or the effect of denying or evading an obligation to arbitrate or of depriving the employer of its bargain." *Id.* at 408, 96 S.Ct. at 3148.

*Boys Markets* and *Buffalo Forge* both involved employers seeking to enjoin employees from striking allegedly in violation of a no-strike clause. Numerous circuit courts have concluded that the principles of these cases are equally applicable to analyzing whether injunctive relief is appropriate to restrain employers from acting so as to undermine the arbitration process.[4] *See, e.g., Consolidated Aluminum*, 696 F.2d at 441; *Panoramic*, 668 F.2d at 280; *Fort Pitt*, 598 F.2d at 1278; *Greyhound II*, 550 F.2d at 1238; *Lever Bros.*, 554 F.2d at 120. We agree with these courts and hold that *Boys Markets* injunctions are available to enjoin employer breaches of collective bargaining agreements which threaten the arbitral process.

■ Amoco does not dispute the availability of injunctive relief against employer breaches, as a general proposition. As it points out in its brief, however, the circuits have employed different methods for determining whether a status quo injunction case fits within the principles announced in *Boys Markets* and *Buffalo Forge*. The two primary approaches were developed by the Ninth and Fourth Circuits. *See Panoramic*, 668 F.2d at 282–83; Cantor, *Buffalo Forge and Injunctions Against Employer Breaches of Collective Bargaining Agreements*, 1980 Wis.L.Rev. 247, 268–74. The Ninth Circuit in *Greyhound II*, 550 F.2d at 1238, construed *Buffalo Forge* as generally limiting the availability of injunctive relief under *Boys Markets* to those situations in which the employer expressly promises to maintain the status quo. We have no such promise in this case. The court acknowledged in *Greyhound II* the appropriateness of inferring a promise to maintain the status quo if necessary to prevent frustration of the arbitral process, but it reasoned that such circumstances would be rare because employer actions generally do not interfere with arbitration. *Id.* at 1238–39.

The approach adopted by the Fourth Circuit in *Lever Brothers*, 554 F.2d at 122–23, by contrast, dispenses with the need for distinguishing between express and implied promises, and instead focuses on the effect the employer's action will have on the ability of the arbitrator to "return the parties substantially to the status quo ante." *Id.* at 123. This approach directly considers whether the employer's action will make the arbitral process a "hollow formality." It is ultimately consistent with the Ninth Circuit's approach because "once it is conceded that a duty to preserve the status quo pending arbitration may be implied," *Panoramic*, 668 F.2d at 282, the dispositive question under *Greyhound II* also becomes whether the action will frustrate the arbitral process. We find the Fourth Circuit position preferable, because we believe it more accurately embodies the rationale underlying the *Boys Markets* exception. It also has the advantage of being more straightforward. We thus join the Third, Fourth, and Seventh Circuits in adopting the frustration-of-arbitration analysis as the standard in this circuit.[5]

---

4. The Supreme Court has not directly addressed the issue, but it encouraged this extension of the principles by vacating and remanding for consideration in light of *Buffalo Forge* the Ninth Circuit decision in *Amalgamated Transit Union, Div. 1384 v. Greyhound Lines, Inc.*, 529 F.2d 1073 (9th Cir.) (*Greyhound I*), *vacated and remanded*, 429 U.S. 807, 97 S.Ct. 43, 50 L.Ed.2d 68 (1976), *rev'd*, 550 F.2d 1237 (9th Cir.1977) (*Greyhound II*), *cert. denied*, 434 U.S. 837, 98 S.Ct. 127, 54 L.Ed.2d 99 (1977), in which employees sought injunctive relief against the employer.

See *Local Lodge No. 1266 v. Panoramic Corp.*, 668 F.2d 276, 280 n. 8 (7th Cir.1981).

5. The Sixth Circuit's position is consistent with *Lever Brothers* although not phrased in exactly the same terms: "[T]he courts have extended the *Boys Markets* exception to embrace employer behavior which has the effect of evading a duty to arbitrate or which would otherwise undermine the integrity of the arbitral process." *Aluminum Workers Int'l v. Consolidated Aluminum Corp.*, 696 F.2d 437, 441 (6th Cir.1982).

See *Nursing Home & Hospital Union No. 434 v. Sky Vue Terrace, Inc.*, 759 F.2d 1094, 1098 (3d Cir.1985) (*Sky Vue*); *Lever Brothers*, 554 F.2d at 122–23; *Panoramic*, 668 F.2d at 282–83.

■ Under *Boys Markets*, a court must also satisfy itself that the " 'ordinary principles of equity' " support the issuance of injunctive relief. *Boys Markets*, 398 U.S. at 254, 90 S.Ct. at 1594 (quoting *Sinclair Refining Co. v. Atkinson*, 370 U.S. 195, 228, 82 S.Ct. 1328, 1346, 8 L.Ed.2d 440 (1962) (Brennan, J., dissenting)). Thus, in addition to establishing that the dispute is subject to mandatory arbitration under the labor contract, *id.*, and that the arbitrable dispute is the underlying dispute and not a collateral one, *Buffalo Forge*, 428 U.S. 408–11, 96 S.Ct. at 3148–49, the moving party must show that it will suffer irreparable injury, that the balance of hardships favors it, and that it has a probability of success on the merits, *Boys Markets*, 398 U.S. at 254, 90 S.Ct. at 1594; *Panoramic*, 668 F.2d at 283. If all of these requirements are satisfied, the proper accommodation of the various conflicting national labor policies will not be undercut by the issuance of an injunction to maintain the status quo. We now consider whether these requirements are met in the instant case.[6]

### III.

■ We review a district court's grant or denial of a preliminary injunction for abuse of discretion. *Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir.1980); *Tri-State Generation v. Shoshone River Power, Inc.*, 805 F.2d 351, 354 (10th Cir.1986). The abuse of discretion standard applies in the context of *Boys Markets* injunctions as well. *See Lever Brothers*, 554 F.2d at 120; *Panoramic*, 668 F.2d at 289; *cf. Brother-*

hood of *Locomotive Engineers v. Missouri–Kansas–Texas Ry.*, 363 U.S. 528, 535, 80 S.Ct. 1326, 1330, 4 L.Ed.2d 1379 (1960) (*M–K–T Railway*). This standard of review requires that we carefully examine the district court's exercise of its discretion, but "we may not ... substitute our own judgment for that of the trial court." *Tri-State Generation*, 805 F.2d at 354–55; *see Roland Machinery Co. v. Dresser Indus.*, 749 F.2d 380, 390 (7th Cir.1984). In addition, we must consider whether the court below relied on clearly erroneous fact findings, or made any clear errors of law. *See Hartford House, Ltd. v. Hallmark Cards, Inc.*, 846 F.2d 1268, 1270 (10th Cir.) ("Unless the district court abuses its discretion, commits an error of law, or is clearly erroneous in its preliminary factual findings, the appellate court may not set aside the injunction."), *cert. denied*, —— U.S. ——, 109 S.Ct. 260, 102 L.Ed.2d 248 (1988).[7]

■ The parties agree that their dispute over Amoco's right to unilaterally implement a drug testing program is arbitrable, and they do not contend that this dispute is a collateral one rather than the underlying dispute.[8] We therefore turn immediately to consider the district court's assessment of the relevant traditional principles of equity.

One of the criteria for injunctive relief is likelihood of success on the merits. Applying this factor in the traditional manner, however, would require courts to inquire into the merits of the dispute and encroach on the role of the arbitrator, a result clearly eschewed by the Supreme Court in *Buffalo Forge*, 428 U.S. at 410–411, 96 S.Ct. at 3149. *See also Consolidated Aluminum*, 696 F.2d at 442 n. 2; *Panoramic*, 668 F.2d at 284–85. We therefore agree with those courts that have adopted the standard first enunciated by the Ninth Circuit in *Greyhound I:*

---

6. We postpone consideration of the frustration-of-arbitration analysis until our discussion of irreparable injury because the two issues coincide. *See infra* at p. 704.

7. We treat these later two inquiries as sub-categories of abuse of discretion review in this context, even though they require application of a distinct standard of review. A district court

abuses its discretion if it relies on clearly erroneous fact findings or commits an error of law in deciding whether to issue a preliminary injunction.

8. We thus do not address the proper standard for making this latter determination. *See Panoramic*, 668 F.2d at 283–84.

"[A] plaintiff, without regard to whether he is the employer or the union, seeking to maintain the status quo pending arbitration pursuant to the principles of *Boys Markets* need only establish that the position he will espouse in arbitration is sufficiently sound to prevent the arbitration from being a futile endeavor. [There must be] a genuine dispute with respect to an arbitrable issue...." *Greyhound I*, 529 F.2d at 1077–78. *See Lever Bros.*, 554 F.2d at 120; *Panoramic*, 668 F.2d at 284–85; *Consolidated Aluminum*, 696 F.2d at 442 n. 2; *see also Sky Vue*, 759 F.2d at 1098 n. 3. *But see, e.g., Hoh*, 491 F.2d at 561 (criterion must mean "not simply some likelihood of success in compelling arbitration but in obtaining the award in aid of which the injunction is sought").

We agree with the district court that the Union's position is sufficiently sound to prevent arbitration from being a futile endeavor. It is not clear from the face of the Agreement that either the Union or Amoco will prevail in arbitration. To the extent Amoco claims it is entitled under the management rights clause to unilaterally implement its drug testing program, it confronts the Union's contention that Article 21, the section dealing with health and safety matters, limits management's prerogatives. Nor do any of the other provisions of the Agreement included in the appellate record decisively favor either party. The district court did not abuse its discretion in concluding that the Union satisfies the likelihood-of-success-on-the-merits requirement.

A party seeking a *Boys Markets* injunction must also establish that it will suffer irreparable injury absent injunctive relief. *Boys Markets*, 398 U.S. at 254, 90 S.Ct. at 1594. The nature of the required irreparable injury assumes a specific character in the context of status quo injunctions

against employer breaches of collective bargaining agreements. Following the Supreme Court's decision in *M–K–T Railway*, 363 U.S. at 534–35, 80 S.Ct. at 1330, courts have construed irreparable injury in this context as an injury that would undermine the integrity of the arbitration process by making an eventual award only an "empty victory." *See, e.g. Panoramic*, 668 F.2d at 285–86, *Lever Brothers*, 554 F.2d at 122, *Consolidated Aluminum*, 696 F.2d at 443.

The irreparable injury inquiry thus coincides with the frustration-of-arbitration analysis used for determining the applicability of the *Boys Markets* exception. *See Retail, Wholesale & Dept. Store Union Local 1034 v. Doxsee Food Corp.*, 650 F.Supp. 861, 865 (D.Del.1986). This coincidence often elevates the assessment of irreparable injury into the central inquiry in status quo injunction cases. *See Consolidated Aluminum*, 696 F.2d at 443. As have other courts, we merge these ideas into a single inquiry. *See Panoramic*, 668 F.2d at 286.

As we begin our analysis, it is helpful to describe in greater detail the nature of Amoco's proposed drug testing program, which would subject its employees to testing in four circumstances. Employees would be tested whenever their "actions, demeanor, or behavior" prompt supervisory personnel to refer the employee to the medical department and medical personnel believe a drug test is appopriate. They also would be tested after "hazardous accidents or near-hazardous accidents," at the discretion of management. All employees would be routinely tested during regularly scheduled annual physical examinations.[9] Finally, an employee who tested positive in any of the above circumstances would be subject to follow-up testing.[10] Rec., vol. III, at 9–10.

This provision makes the transformation of the annual testing to random testing a real possibility.

---

**9.** The Union points out that Amoco's proposal provides for more frequent testing when the company deems it is necessary. *See* Rec., vol. III, at 144. "In most cases, drug and alcohol testing for employees will be conducted annually. However, *management may direct more frequent testing* when it is deemed necessary." Rec., vol. I, doc. 1, Ex. B at 3 (emphasis added).

**10.** It should be noted that Amoco's proposal leaves open-ended the period following a positive test during which an employee would re-

Acknowledging that Amoco is entitled to test for cause, the Union focuses its challenge on the testing to be conducted at the annual physical examinations and the follow-up testing, both of which it believes constitute testing without cause. Of particular concern to the Union in this regard are the detection levels for positive results established by the proposed policy. These levels are unusually low in the case of alcohol and marijuana, according to evidence submitted by the Union, and positive test results for them would not correlate to the impairment of an individual at the time of testing. Rec., vol. I, doc. 4, Affidavit of Richard E. Collins; Rec., vol. III, at 44. Amoco's manager of human resources at the Salt Lake City refinery conceded on cross-examination that traces of marijuana can remain in a person's system long after its use. *Id.* at 127–28. The low detection levels of Amoco's drug testing program, the Union contends, would result in the regulation of the private lives of its employees, regulation which exceeds Amoco's legitimate interests as an employer. This potential intrusion into the employees' private lives threatens to cause them stigmatization, humiliation, and damage to reputation. These injuries would be all the more grievous, the Union argues, because of the numerous familial relationships between its members, and the strong religious character of the community. Rec., vol. III, at 41, 74.

The majority of Amoco's argument focuses on what types of potential injury are so irreparable as to threaten the integrity of the arbitral process.[11] Amoco contends that because work-related drug and alcohol discipline cases are the "grist for the mill of grievance procedures and arbitration," the arbitration process necessarily must afford adequate remedies to employees "enmeshed in a drug or alcohol" case. Relying on *Panoramic*, 668 F.2d at 285 n. 12, Amoco also urges that the type of harm alleged is legally insufficient to warrant injunctive relief. These arguments, which are variations on a single theme, present the question whether invasion of privacy, stigmatization, and humiliation qualify as irreparable injuries that threaten to frustrate the arbitral process. In addition, Amoco contends that the harm alleged by the Union is too speculative.

The Union replies that the stigmatization and humiliation resulting from the drug testing program's invasion of privacy[12] can support findings of irreparable injury because these injuries cannot be redressed by an arbitral award. The Union counters Amoco's speculativeness charge by pointing to testimony before the district court concerning workers' responses to the program.

In support of its primary argument, Amoco relies on two cases involving suits to enjoin the implementation of drug testing programs at two of its other refiner-

---

main subject to follow-up testing. Rec., vol. III, at 99–100.

**11.** In addition, Amoco argues that the district court misapplied the *Boys Markets* exception when it looked to the inadequacy of the remedy available to employees adversely affected by Amoco's program. In so doing, Amoco misconstrues the frustration-of-arbitration analysis and misunderstands its relationship to the concept of irreparable injury.

The frustration-of-arbitration analysis focuses on actions by a party that, although not literally interfering with the arbitral process, will irreparably injure the other party and thereby undermine the arbitration by making it impossible for an arbitrator to award an adequate remedy. Assessing the adequacy of the remedy, contrary to Amoco's assertion, does not require that the court infringe on the arbitrator's territory. As the court in *Panoramic* stated in response to a

similar argument, "an examination of the arbitrable dispute to determine whether irreparable injury is threatened ... is very different from the examination subsequently to be made by an arbitrator." 668 F.2d at 285. *Cf. M–K–T Railway*, 363 U.S. at 533–34, 80 S.Ct. at 1329–30. If accepted, Amoco's argument, like Panoramic's, would essentially prevent the issuance of *Boys Markets* injunctions in virtually every case.

**12.** Interwoven throughout the Union's argument is the suggestion that refusing to be tested will result in immediate termination, and testing positive will lead to immediate suspension. These consequences are relevant here only to the extent they contribute to the stigmatization and humiliation of the workers. Wrongful termination or suspension can be compensated by reinstatement and backpay. *See Panoramic*, 668 F.2d at 286.

ies.[13] The district courts in both instances declined to issue the requested injunctive relief. In *Oil, Chemical & Atomic Workers, Local 6–10 v. Amoco Oil Co.*, 653 F.Supp. 300, 303 (D.N.D.1986) (OCAW, Local 6–10), the court concluded that irreparable injury would not result from Amoco's implementation of its new drug policy because 1) the policy did not qualitatively alter existing company policies against the use of alcohol and drugs while working, or the possession of such substances on the refinery grounds; 2) affected employees could be "made whole" by reinstatement and backpay, and stigmatization did not constitute irreparable injury; and 3) the arbitration process itself would be "unaffected" by the company's unilateral implementation of the program. The court in *Oil Chemical & Atomic Workers, Local 2–124 v. Amoco Oil Co.*, 651 F.Supp. 1, 5 (Wyo.1986), while apparently acknowledging the possible stigmatization of employees, also concluded that reinstatement and backpay were adequate remedies. Neither of these decisions was appealed.

The Union relies heavily on an unpublished opinion from the district court for the Eastern District of Pennsylvania. *International Brotherhood of Electrical Workers System Council 4–9 and Local 563 v. Metropolitan Edison Co.*, CA No. 86–4426, 1986 WL 376 (E.D.Pa.1986). This opinion has no precedential value per se, but we find relevant the court's conclusion that the invasion of privacy associated with drug testing, and resulting humiliation and damage to reputation, constitute irreparable injury.

Several other district court opinions have treated the drug testing issue in the *Boys Markets* context. Two opinions reach conclusions consistent with *Metropolitan Edison*. In *Stove, Furnace & Allied Appli-*

*cance Workers' Int'l, Local 185 v. Weyerhaeuser Paper Co.*, 650 F.Supp. 431 (S.D. Ill.1986), the union contended that the testing program could in certain circumstances invade the privacy of its members and result in a " 'black mark' on the[ir] personnel records." *Id.* at 433. The court agreed, concluding that these contentions were sufficient to show irreparable injury. *Id.* at 434. *See also International Brotherhood of Electrical Workers v. Florida Power & Light*, 678 F.Supp. 257, 258 (S.D.Fla.1987).

In a third case, *International Brotherhood of Electrical Workers, Local 1900 v. Potomac Electric Power Co.*, 634 F.Supp. 642 (D.D.C.1986), the court implied that implementation of a wide ranging drug testing program could result in irreparable injury. There, Potomac Electric unilaterally imposed a new drug testing regime. The court rejected the union's allegations of injury resulting from potential invasions of privacy and unjustified discharges,[14] because it found that the company's in-court representations "guarantee that the scope of testing of PEPCO employees will remain essentially unchanged from the policy prior to March 13, 1986 pending an arbitral decision...." *Id.* at 645. The court held that the postponement of the potentially broad application of the new rules removed the specter of irreparable injury, and the justification for a status quo injunction under the *Boys Markets* exception, because the only new injuries that could possibly result were not materially different than injuries possible under the old policy. The court's reasoning suggests that it would have found irreparable injury and enjoined implementation of the new rules had the company been unwilling to postpone their implementation.

Contrary to the opinion in *OCAW, Local 6–10*, 653 F.Supp. at 303, we are convinced

---

**13.** The drug testing program instituted at Amoco's Mandan, North Dakota and Casper, Wyoming refineries is apparently identical to the one proposed for the Salt Lake City refinery. Brief of Appellant at 2.

**14.** The parties also disputed the extent to which the company's new program altered the previous policy. The company claimed the new program merely imposed stiffer penalties, whereas

the union contended that the new program additionally permitted testing at random and without cause. The court concluded that the imposition of stiffer penalties did not "materially change the effect on an employee's reputation which would be affected by some lesser penalty...." *International Brotherhood of Electrical Workers, Local 1900 v. Potomac Electric Power Co.*, 634 F.Supp. 642, 644 (D.D.C.1986).

that implementation of a drug testing program is qualitatively different than the existence of policies against the use and possession of drugs in the workplace. This is especially true where, as here, the program includes wide ranging testing without cause [15] and utilizes low thresholds for positive results. The record indicates that because of the low detection levels selected by Amoco, an employee could test positive when his prior use of a drug or alcohol is not impairing his job performance. Rec., vol. I, doc. 4, Affidavit of Richard E. Collins; rec., vol. III, at 44. Consequently, the qualitative difference does not just threaten an incremental increase in damage to reputation, such as the increased penalties in *Potomac Electric*, it threatens to invade an employee's privacy by disclosing information about his off-the-job conduct that is unrelated to his performance at work. The attenuation of the relationship between Amoco's legitimate interests in implementing a drug testing program and the actual scope of the program makes the potential invasion of privacy especially egregious.

Moreover, even if we accept Amoco's assurances of confidentiality, employee privacy remains threatened. An employee who tests positive at the low detection levels will be required either to enter a rehabilitation program, or to take thirty days off work. The record reflects that as a practical matter, the employee's co-workers would know that he is attending a rehabilitation program, or would notice his absence when his shifts have to be filled. *Id.* at 67–68. Alternatively, an employee's co-workers would learn of positive test results by virtue of the Union's representation of the employee in a grievance proceeding. *Id.* at 67.

In light of the invasion of privacy threatened by Amoco's testing program, and the potential for stigmatization and humiliation of its employees, we do not believe that an arbitral award of reinstatement and back-pay could make affected employees whole. These injuries would potentially be all the more severe because of the close-knit character of the employees and the fact that the predominant religion in the community proscribes the drinking of alcoholic beverages. *Id.* at 41 and 74. The consequences of revelations about drug or alcohol use could have long term consequences for a member of such a community. For these reasons, we are persuaded that the integrity of the arbitration process will be seriously undermined by Amoco's unilateral implementation of the testing program. Once an employee's reputation is sullied, we see no way that an arbitral award prohibiting the company from unilaterally implementing the drug testing program would provide relief. We thus agree with the district court that the invasion of privacy, stigmatization, and humiliation alleged by the Union constitute irreparable injuries that threaten the integrity of the arbitral process and adequately support the issuance of a status quo injunction.

We are aware that some courts have been reluctant to recognize every irreparable injury as a sufficient basis for issuing a status quo injunction. These courts have created a category of injuries that are considered irreparable, but not so irreparable that they undermine the integrity of the arbitral process. The court in *Panoramic*, for example, concluded that injuries frequently suffered by employees pending arbitration of their disputes, but "not compensated by the contract remedies (in contrast to tort damages) typically awarded in arbitration," can not form the basis for injunctive relief. *Panoramic*, 668 F.2d at 285 n. 12. The types of injuries the court had in mind are the lost interest on earn-

---

**15.** In its recent decision in *Consolidated Rail Corp. v. Railway Labor Executive Ass'n*, ⸺ U.S. ⸺, ⸺, 109 S.Ct. 2477, 2488, 105 L.Ed.2d 250 (1989), the Supreme Court recognized the difference between testing for cause and routine testing, and acknowledged that this difference "perhaps could be of significance to arbitrators in deciding the merits of drug testing disputes." Although the Court declined to rely on this distinction for the limited purpose of assessing whether Conrail's claim of its contractual right to implement a drug testing program was "obviously insubstantial," *id.*, we believe the Court's recognition of the distinction's potential relevance to the merits supports our reliance on it for the somewhat broader purpose of evaluating irreparable injury.

ings and expenses incurred by an employee improperly discharged and seeking other employment; the uncompensated injuries suffered by an employee on the job pending arbitration of a grievance over safety; and injuries resulting from an employer's unauthorized change in his employees' vacation schedules, such as lost deposits, schedule changes for the family, and general inconvenience. *See* Payne, *Enjoining Employers Pending Arbitration—From M–K–T to Greyhound and Beyond*, 3 Ind. Rel.L.J. 169, 199 (1979); *Cf. Consolidated Aluminum*, 696 F.2d at 444–45 ("repossessions, foreclosures, and injury to credit rating" not the type of harm that threatens the integrity of the arbitral process). However, our review of the Supreme Court's decision in *M–K–T Railway*, the source of the irreparable injury standard in the status quo injunction context, reinforces our conviction that the stigmatization and humiliation alleged here are injuries sufficient to support the issuance of a status quo injunction in this context.[16]

The Court in *M–K–T Railway* considered whether district courts may impose status quo obligations on employers as a condition for issuing no-strike injunctions in order to prevent irreparable injury to employees and thereby preserve the jurisdiction of the

National Railroad Adjustment Board.[17] In assessing whether the conditions imposed by the district court protected the jurisdiction of the board, the Court reasoned:

"The dispute out of which the judicial controversy arose does not merely concern rates of pay or job assignments, but rather involves the *discharge of employees from positions long held and the dislocation of others from their homes.* From the point of view of these employees, the critical point in the dispute may be when the change is made, for, by the time of the frequently long-delayed Board decision, it might well be *impossible to make them whole in any realistic sense.* If this be so, the action of the district judge, rather than defeating the Board's jurisdiction, would operate to preserve that jurisdiction by preventing *injury so irreparable* that a decision of the Board in the unions' favor would be but an empty victory."

*M–K–T Railway*, 363 U.S. at 534, 80 S.Ct. at 1330 (emphasis added). Significantly, the Court's discussion of irreparable injury indicates that it viewed the issue in a manner consistent with traditional concepts of irreparable injury. The Court in no way indicates that a higher threshold for such a finding should apply in the context of a

16. *Lever Brothers*, 554 F.2d 115 (4th Cir.1976), also supports a broad reading of the types of irreparable injury sufficient to support status quo injunctions. The parties in *Lever Brothers* disagreed over the proper characterization of the company's decision to close one plant and transfer production to a facility in another state. The union argued that the proposed action constituted a "contracting out" under the contract. Therefore, contended the union, the company was required to provide it with "full information" about the action and to reach a final decision only after giving "due consideration" to the employees' interests. *Id.* at 118–19. The threatened injury in *Lever Brothers* was thus the union's loss of its right to participate in the decision-making process. Although a permanent loss of jobs would result from the transfer, this was not the injury which threatened the integrity of the arbitral process because the company was entitled to take the action after due consideration of the employee's interests.

17. The relevance of *M–K–T Railway* is not diminished by the fact that it involves the Railway Labor Act (RLA), 45 U.S.C. §§ 151–188 (1982), which establishes a system of compulsory arbitration, rather than the LRMA. The Supreme

Court made clear in *Boys Markets*, 398 U.S. at 251–52, 90 S.Ct. at 1592–93, that the concerns underlying its accommodation of Norris–LaGuardia and the RLA, also underlay its accommodation of Norris–LaGuardia and the LMRA:

"The court concluded [in *Brotherhood of Railroad Trainmen v. Chicago River & Ind. R. Co.*, 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957)] that ... Norris–LaGuardia's policy of nonintervention by the federal courts should yield to the overriding interest in the successful implementation of the arbitration process [established by the RLA]."

"The principles elaborated in *Chicago River* are equally applicable to the present case." The Court so concluded because of the importance assigned to arbitration in the administration of collective bargaining agreements by Congress. Similarly, the concerns underlying the reasoning of *M–K–T Railway* about the circumstances under which status quo obligations may be imposed as a condition of no-strike injunctions are sufficiently analogous to the concerns facing us here that its reasoning is "equally applicable" in this context.

status quo injunction. Moreover, the language used by the Court to describe injuries it considered irreparable, the discharge of employees from long held positions and the dislocation of employees from their homes, strongly suggests that courts should use a wide focus in assessing the nature of the threatened injury, as well as adopt a broad view of what constitutes irreparable injury in this context. There seems no other way to account for the Court's characterization of discharge and dislocation as irreparable given, for example, that reinstatement and backpay has traditionally been considered an adequate remedy for improper discharge. It is especially the collateral effects of being discharged from long held employment or being dislocated from one's home that make it "impossible to make [employees] whole in any realistic sense." *Id.*

Our holding does not undermine the framework established by the Supreme Court for accommodating Norris–LaGuardia's policy against widespread judicial involvement in labor disputes to the LMRA's provision permitting judicial enforcement of collective bargaining agreements. This accommodation was intended to protect the arbitral process by preventing injuries that could not be adequately redressed through an arbitral award. Our holding furthers this goal.

As for Amoco's argument that the alleged injuries are too speculative, we note that district courts have wide discretion in exercising their equitable powers. *M–K–T Railway*, 363 U.S. at 535, 80 S.Ct. at 1330. The scope of these powers is jurisdictionally circumscribed in the context of labor disputes, but once it is determined that jurisdiction is proper, the court may freely

exercise its powers. Based on our review of the record, we decline to hold that the district court in this case abused its discretion in concluding that the Union's allegations of irreparable injury were not speculative.

The last[18] of the traditional equitable principles that a party seeking *Boys Markets* injunctive relief must satisfy is that the balance of hardships favors issuance of the injunction. *Boys Markets*, 398 U.S. at 254, 90 S.Ct. at 1594. An examination of the record reveals that the district court found no evidence of a drug problem at the Salt Lake City refinery, but only of a nationwide problem. As a consequence, the court concluded that no injury to Amoco would result except for a delay in the testing program. On the other hand, the court found that the Union members would be irreparably injured by implementation of the program. The district court thus found that the balance of hardships favored issuance of the injunction. We are not persuaded that the district court abused its discretion in this regard.

### IV.

We affirm the order of the district court for the aforementioned reasons. Our ruling should not be construed as in any respect indicating this court's view of issues that the parties have agreed to submit to arbitration.

AFFIRMED.

BALDOCK, Circuit Judge, dissenting.

This case was argued and submitted to the court on July 16, 1987. The arbitrator has had the same dispute under advisement since October 7, 1988, and no doubt awaits our decision.[1] Notwithstanding, the court

---

**18.** Although public interest findings are not one of the traditional equitable principles referred to by the *Boys Markets* Court, the court below found that issuance of the injunction in this case was in the public interest. Amoco's final argument focuses on this issue. Amoco urges that both federal and state policy favor drug testing. Amoco's argument fails to mention another important, and in this instance, countervailing policy consideration: the peaceful resolution of labor disputes through voluntary arbitration.

**1.** Our delay in rendering a decision surely contravenes section 10 of the Norris–LaGuardia Act, as amended, which states:

Whenever any court of the United States shall issue or deny any temporary injunction in a case involving or growing out of a labor dispute, the court shall, upon the request of any party to the proceedings and on his filing the usual bond for costs, forthwith certify as in ordinary cases the record of the case to the court of appeals for its review. Upon the filing of such record in the court of appeals,

**710**

ignores the maxim that a dispute over the interpretation of a collective bargaining agreement must be resolved not by a court, but as the parties have agreed, by an arbitrator. *E.g., Brotherhood of Locomotive Eng'rs v. Missouri–Kansas–Texas R.R. Co.,* 363 U.S. 528, 533, 80 S.Ct. 1326, 1329, 4 L.Ed.2d 1379 (1960). The court today does nothing less than render a decision on the merits of a labor dispute, albeit under a one-sentence disclaimer at the conclusion of its opinion, Court's Opinion at 709, that will certainly influence if not preempt the arbitrator's views. *Buffalo Forge Co. v. United Steelworkers,* 428 U.S. 397, 412, 96 S.Ct. 3141, 3150, 49 L.Ed.2d 1022 (1976). I respectfully dissent.

Amoco's drug testing program essentially consists of three parts: (1) annual testing, (2) testing for cause, and (3) periodic retesting for employees testing positive in either of the first two instances. The union does not object to testing for cause but rather contends that annual testing and periodic retesting constitute arbitrary invasions of its members' privacy. For years, however, Amoco has required an annual physical examination of its employees during which both a urine specimen and blood sample are taken. The union has never objected. Thus, Amoco's acquisition of the urine specimen and blood sample are not disputed. While the Supreme Court has recognized that the "procedures for collecting the necessary samples, which require employees to perform an excretory function traditionally [have been] shielded by great privacy," *Skinner v. Railway Labor Executives' Ass'n,* —— U.S. ——, 109 S.Ct. 1402, 1418, 103 L.Ed.2d 639 (1989), we are not concerned in this case with "procedures." Only the actual screening of the employees' urine and blood for drugs is in issue. Still, the union argues that an "arbitrator would find offensive and in violation of the contract such testing policy." Appellee's Brief at 15. Yet the arbitrator's

substantive construction of the collective bargaining agreement is not our concern.

To justify its intrusion into the arbitration process, the court focuses largely on the district judge's finding that the union's members would suffer irreparable harm via an invasion of privacy if Amoco was not enjoined from implementing its drug testing program pending arbitration. *See* Court's Opinion at 707–09. The court correctly notes that such a finding generally may not be overturned unless clearly erroneous. *Amoco Oil Co. v. Rainbow Snow, Inc.,* 809 F.2d 656, 663 (10th Cir.1987). But fact-findings made under an erroneous view of the law or in the absence of a defined legal standard are not binding on appeal. *Pullman Standard v. Swint,* 456 U.S. 273, 287, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982). Although the district judge expressed a belief that his failure to award the union injunctive relief would render arbitration meaningless, he did not adequately explain why. Instead, the judge seemed to have imposed a personal conviction upon the governing law when he stated: "Employees should not be subjected to that [drug testing] in my view, and they would suffer irreparable injury.... This [drug testing program] is essentially based upon a national program that you [Amoco] want to institute, and if you do, you ought to institute it right." Rec. vol. III at 159–60.

We must begin with the language contained in section one of the Norris–LaGuardia Act, 29 U.S.C. § 101: "No court of the United States ... shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute...." As construed, section one divests the district court of jurisdiction and precludes the issuance of an injunction where the denial of injunctive relief would not result in frustration of the arbitral process. *See Buffalo Forge,* 428 U.S. at 404–412, 96 S.Ct. at 3146–50.[2] In *Boys Markets, Inc. v. Retail*

the appeal shall be heard and the temporary injunctive order affirmed, modified, or set aside *expeditiously.*

29 U.S.C. § 110 (emphasis added).

2. Because we have adopted a modified interpretation of the "likelihood of success on the merits" requirement, holding that "it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, diffi-

*Clerks. Union*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), the Supreme Court fashioned a "narrow" exception to the anti-injunction provisions of the Norris–LaGuardia Act, 29 U.S.C. §§ 101–15. In order to enforce the union's express promise to arbitrate, the Court enjoined a labor strike in breach of a no-strike obligation under a collective bargaining agreement stating that "a no-strike obligation ... is the *quid pro quo* for an undertaking by the employer to submit grievance disputes to the process of arbitration." *Id.* at 248, 90 S.Ct. at 1591. Subsequently, in *Buffalo Forge*, 428 U.S. at 404–12, 96 S.Ct. at 3146–50, the Court further delineated the limits of *Boys Markets* when it refused to enjoin a union's sympathy strike where management and labor had agreed to arbitrate whether such a strike was in violation of the collective bargaining agreement. The Court explained:

> [An injunction] would cut deeply into the policy of the Norris–LaGuardia Act and make the courts potential participants in a wide range of arbitrable disputes under the many existing and future collective bargaining contracts, *not just for the purpose of enforcing promises to arbitrate, which was the limit of Boys Markets*, but for the purpose of preliminarily dealing with the merits of the factual and legal issues that are subjects for the arbitrator and of issuing injunctions that would otherwise be forbidden by the Norris–LaGuardia Act.
>
> This is not what the parties have bargained for. Surely it cannot be concluded here, as it was in *Boys Markets*, that such injunctions pending arbitration are essential to carry out promises to arbitrate and to implement the private arrangements for the administration of the contract. As is typical, the agreements in this case outline the prearbitration settlement procedures and provide that if the grievance "has not been ... satisfac-

torily adjusted," arbitration may be had. Nowhere do they provide for coercive action of any kind, let alone judicial injunctions, short of the terminal decision of the arbitrator. The parties have agreed to submit to grievance procedures and arbitrate, not to litigate. They have not contracted for a judicial preview of the facts and the law. ... The parties' agreement to adjust or to arbitrate their differences themselves would be eviscerated if the courts for all practical purposes were to try and decide contractual disputes at the preliminary injunction stage.

*Id.* at 410–12, 96 S.Ct. at 3149–50 (emphasis added).

Thus, *Buffalo Forge* cautions federal courts "to stay out of the merits of labor disputes." *Lever Bros. Co. v. International Chem. Workers Union*, 554 F.2d 115, 123 (4th Cir.1976). Injunctive relief as an exception to the Norris–LaGuardia Act is appropriate only when necessary to enforce an agreement to arbitrate. *Local Lodge No. 1266 v. Panoramic Corp.*, 668 F.2d 276, 281 (7th Cir.1981). In other words, an injunction in aid of arbitration is necessary when its absence would render the arbitral process a "hollow formality." Court's Opinion at 702. *But cf. Utility Workers v. Southern California Edison Co.*, 852 F.2d 1083, 1088 (9th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 1530, 103 L.Ed.2d 835 (1989) (district court erred in issuing injunction against implementation of drug testing program where employer did not expressly or impliedly promise to maintain status quo pending arbitration). Because frustration of the arbitral process would constitute irreparable injury to the aggrieved party, courts have focused on the former to determine the latter. *E.g., Aluminum Workers Int'l Union v. Consolidated Aluminum Corp.*, 696 F.2d 437, 443 (6th Cir.1982).

---

cult and doubtful, as to make them fair ground for litigation," *City of Chanute v. Kansas Gas and Elec. Co.*, 754 F.2d 310, 314 (10th Cir.1985), I agree with the court that, in view of article 21 of the collective bargaining agreement, arbitration of the parties' dispute is not a "futile endeavor." Court's Opinion at 704. Similarly,

because the record reflects no history of drug-related accidents at the Salt Lake City refinery and no evidence of a drug problem among its employees, I believe the balance of hardships weighs in favor of the union, *see id.* at 709, despite the lack of irreparable injury. *See infra* at 712–13.

This court's suggestion that we "use a *wide* focus in assessing the nature of the threatened injury, as well as adopt a *broad* view of what constitutes irreparable injury," Court's Opinion at 709 (emphasis added), is simply wrong. The cases on which the court relies do not stand for such a proposition. For instance, in *Brotherhood of Locomotive Eng'rs*, 363 U.S. at 528, 80 S.Ct. at 1327, the Supreme Court approved a district court order preventing the railroad from eliminating the jobs of certain freight crews and changing the home terminals of other crews prior to arbitration. The Court reasoned that because the railroad proposed to discharge or dislocate employees from long held positions, the arbitrator in the absence of a temporary injunction could not "make them whole in any realistic sense," if they prevailed on the merits. *Id.* at 534, 80 S.Ct. at 1330. Likewise, in *Panoramic*, 668 F.2d at 276, the Seventh Circuit upheld an injunction restraining an employer from selling its corporate assets pending an arbitrator's decision on the union's claim that the sale violated the parties' collective bargaining agreement. The court concluded that because the employer's proposed action threatened a permanent loss of jobs, a damage remedy was inadequate: "Consummation of the sale would have left the arbitrator with no certain and effective means of remedying the breach of contract that the union has alleged." *Id.* at 288. *Lever Bros.*, 554 F.2d at 115, presented the Fourth Circuit with a similar scenario. In that case, Lever Brothers sought to transfer its Baltimore, Maryland soap production operation to Hammond, Indiana. The district court enjoined the company from moving pending arbitration and the court of appeals affirmed: "[H]ad there not been an injunction pending arbitration to preserve the *status quo*, the employees at the Baltimore plant *would have been totally and permanently deprived of their employment.*" *Id.* at 122 (emphasis in original). Despite this court's contrary assertions, Court's Opinion at 709, reinstatement and backpay for the employees in these cases would have been difficult at best given the fundamental change in business structure and operations. Thus, injunctive relief operated to preserve the arbitrators' jurisdiction "by preventing injury so irreparable that a decision of the [arbitrators] in the unions favor would be but an empty victory." *Brotherhood of Locomotive Eng'rs*, 363 U.S. at 534, 80 S.Ct. at 1330. Such is not the case here. To be sure, those employees who *might* be accused unjustly of drug use *may* suffer some stigmatization which backpay and reinstatement cannot fully redress. But "[i]rreparable injury means not simply any injury resulting from a breach of contract that would not be fully redressed by an arbitral award," *Panoramic*, 668 F.2d at 278, but rather that which would make arbitration a *futile endeavor.*

This court expresses grave concern over Amoco's purported attempt to regulate the private lives of its employees. Relying on the union's expert, the court claims that the detection levels for alcohol and marijuana are so low that a positive test result "would not correlate to the impairment of an individual at the time of testing," Court's Opinion at 705, and thus would exceed Amoco's legitimate interest in testing. Maybe; maybe not. That merits determination, like the determinations of whether the union should have input into the company's testing procedures or whether testing at the refinery should be banned outright, is for the arbitrator to decide.

The court does not identify the source of the employees' right to privacy it directly relies upon for its advisory holding. Because Amoco is not a state actor, the Constitution's guarantee of privacy is inapplicable. *See Griswold v. Connecticut*, 381 U.S. 479, 480–86, 85 S.Ct. 1678, 1679–83, 14 L.Ed.2d 510 (1965). Moreover, I am unaware of any general federal common law right to privacy. Any right to privacy, therefore, must come from federal labor law for section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, preempts state law, mandating resort to federal law in the interpretation of collective bargaining agreements. *E.g., Teamsters v. Lucas Flour Co.*, 369 U.S. 95, 103–104, 82 S.Ct. 571, 576–77, 7 L.Ed.2d

593 (1962). Because the Constitution is inapplicable in the absence of state action and no general federal common law right to privacy exists, the court must rely on either the express terms of the agreement or industrial common law to find this right of privacy, and in doing so encroaches upon the jurisdiction of the arbitrator. As Justice Douglas so aptly explained in *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 581–82, 80 S.Ct. 1347, 1352–53, 4 L.Ed.2d 1409 (1960):

> The labor arbitrator's source of law is not confined to the express provisions of the contract, as the industrial common law—the practices of the industry and the shop—is equally a part of the collective bargaining agreement although not expressed in it. The labor arbitrator is usually chosen because of the parties' confidence in his knowledge of the common law of the shop and their trust in his personal judgment to bring to bear considerations which are not expressed in the contract as criteria for judgment. The parties expect that his judgment of a particular grievance will reflect not only what the contract says but, insofar as the collective bargaining agreement permits, such factors as the effect upon productivity of a particular result, its consequences to the morale of the shop, his judgment whether tensions will be heightened or diminished.... *The ablest judge cannot be expected to bring the same experience and competence to bear upon the determination of a grievance, because he cannot similarly be informed.*

(emphasis added).

The reason why the irreparable injury requirement for injunctive relief must be narrowly viewed and the anti-injunction provisions of the Norris–LaGuardia Act given effect is because the expertise of the arbitrator is "foreign to the competence of courts." *Id.* at 581, 80 S.Ct. at 1347. Regardless of this court's ruling, the propriety of Amoco's drug testing program ultimately rests with the arbitrator. Arbitration would not be rendered a "hollow formality" in the absence of temporary injunctive relief, for the arbitrator will structure

the plan as required by the contract and industry practice. *See Oil, Chem. & Atomic Workers v. Amoco Oil Co.*, 653 F.Supp. 300, 303 (D.N.D.1986) (holding that no injunction should issue against Amoco's drug testing plan at North Dakota refinery); *Oil, Chem. & Atomic Workers v. Amoco Oil Co.*, 651 F.Supp. 1, 4–5 (D.Wyo. 1986) (holding that no injunction should issue against Amoco's drug testing plan at Wyoming refinery). Today the court does little more than advise the arbitrator how this labor dispute should be decided. I can think of few labor disputes where this court's decision will not be cited for the proposition that a court of law should issue a preliminary injunction pending arbitration when asked to do so. I would reverse the judgment of the district court and remand with instructions to vacate the injunction and dismiss the complaint for want of jurisdiction.