**INDEPENDENT OIL WORKERS UNION, et al., Plaintiffs,**

v.

**MOBIL OIL CORPORATION, Defendant.**

Civ. A. No. 91–4760.

United States District Court, D. New Jersey.

Nov. 8, 1991.

**392**

Jonathan Walters, Willig, Williams & Davidson, Philadelphia, Pa., for plaintiffs.

Lawrence S. Coburn, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for defendant.

## MEMORANDUM OPINION

GERRY, Chief Judge.

### I. INTRODUCTION

On October 25, 1991, the Independent Oil Workers Union (the "Union") asked this court to enjoin the Mobil Oil Company ("Mobil") from unilaterally implementing a random drug and alcohol testing program in its Paulsboro Refinery pending arbitration of the matter pursuant to the collective bargaining agreement between the parties. The Union also asked us to declare that the matter was arbitrable at its pre-implementation stage and to order expedited arbitration.

On November 4, 1991, we denied the Union's motion for a preliminary injunction, but found that the matter was arbitrable before implementation. Additionally, we declined to order expedited arbitration. Our decision left Mobil free to implement its random drug and alcohol testing program and left the Union free to grieve and arbitrate the matter without having to await a disciplinary action instituted by Mobil pursuant to the program.

### II. BACKGROUND

The Union was certified by the National Labor Relations Board on March 17, 1945, as the exclusive bargaining representative for the production, maintenance, and laboratory employees employed by Mobil at the Paulsboro Refinery. In 1985, Mobil first proposed implementing a random drug and alcohol testing program for employees in "safety/security sensitive" positions. The Union filed a grievance over the matter and eventually demanded arbitration. However, this demand was withdrawn after Mobil agreed to drop the random element of its policy and restrict drug and alcohol testing to those cases in which there was reasonable suspicion.[1]

On March 26, 1990, the parties entered into a new three year collective bargaining agreement (the "Agreement"). In October 1990, Mobil renewed its intention unilaterally to implement a random drug and alcohol testing policy. The Union objected, and requested that Mobil delay implementation and submit the matter to expedited arbitration. The Union also filed a grievance over the decision to implement the policy. In late October, 1990, Mobil rejected this grievance, insisting that it was "inappropriate and premature," and offered to bargain with the Union concerning the new policy. The Union agreed to bargain; however, it insisted that Mobil was bound by the drug and alcohol testing policy adopted in 1985, and that it was a violation of the Agreement to revise the policy.

On September 5, 1991, Mobil advised the Union that it would implement the revised policy on November 4, 1991. The Union objected, and on September 16, 1991, filed a grievance over the decision to implement the revised policy. The Union also advised Mobil that it wished to submit the matter to expedited arbitration. On September 30, 1991, after negotiations between the parties,[2] Mobil advised the Union that it considered the grievance to be premature until a Union member was disciplined pursuant to the program, and refused to waive the grievance procedure and submit the matter to expedited arbitration. This lawsuit followed.

---

1. The Union apparently agreed to allow Mobil to implement a program of random testing for those employees who had undergone treatment for substance abuse problems.

2. Mobil contends that the parties reached impasse over the issue.

## III. MOBIL'S REVISED DRUG AND ALCOHOL CONTROL POLICY

There is no dispute that the operations conducted at the Paulsboro Refinery are ultrahazardous, and Mobil's safety concerns are obviously appropriate. Avowedly dissatisfied with the results of its reasonable suspicion and voluntary drug and alcohol testing program, and concerned about both prevention and deterrence, Mobil declared its intention to institute the random testing program at issue here.

Under Mobil's revised policy, employees in safety/security sensitive positions[3] become subject to random testing to screen for a variety of drugs, as well as alcohol.[4] Employees are to be randomly selected by computer for screening, and 50% of eligible employees are to be randomly tested annually.[5] Employees who decline to consent to screening are considered to have tested positive. A positive test of an employee with more than six months service results in suspension without pay.[6] Such employees are offered rehabilitation as a condition to continued employment. An employee with less than six months service who tests positive is terminated.[7]

## IV. DISCUSSION

■ We have jurisdiction over this dispute pursuant to section 301(a) of the Labor Management Relations Act of 1947, 29 U.S.C. § 185, which covers suits for violations of contracts between employers and labor unions. Our equitable jurisdiction is restricted, however, by the Norris–LaGuardia Act, 29 U.S.C. §§ 101–115, which restrains us from granting injunctions in cases involving labor disputes. We are nevertheless permitted to enjoin employer actions in order to preserve the status quo in aid of arbitration. *See Buffalo Forge Co. v. United Steelworkers of America,* 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976); *Boys Markets, Inc. v. Retail Clerk's Union, Local 770,* 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970); *Nursing Home & Hospital Union No. 434 v. Sky Vue Terrace, Inc.,* 759 F.2d 1094, 1098 (3d Cir.1985) ("a *Boys Markets* injunction is appropriate only where necessary to prevent conduct that threatens or frustrates the arbitral process agreed to by the parties"); *Lever Brothers Co. v. International Chemical Workers Union, Local 217,* 554 F.2d 115, 123 (4th Cir.1976).

Before issuing a *Boys Markets* injunction, we must first establish that the parties are contractually bound to arbitrate the dispute and must then "consider whether issuance of an injunction would be warranted under ordinary principles of equity." *Boys Markets,* 398 U.S. at 254, 90 S.Ct. at 1594. *See also Sky Vue,* 759 F.2d at 1098 ("To establish that an order enjoining employer conduct is necessary to ensure that the arbitral process will not be frustrated, the party seeking the injunction must prove not only that the underlying disputes are arbitrable, but that the traditional requirements of injunctive relief—probability of success on the merits, irreparable injury, and a balance of hardships—support the award.").

We address these issues in turn.

### A. *Arbitrability*

■ The grievance clause of the Agreement is quite broad, and encompasses dis-

---

**3.** The company apparently considers nearly all of the five hundred-plus bargaining unit refinery employees to be included in this category.

**4.** The list of drugs tested for includes amphetamines, antidepressants, barbiturates, benzodiazepines (valium), cannabinoids, cocaine, methadone, methaqualone, opiates, phencyclidine (PCP), and propoxyphene (darvon).

**5.** Mobil reported to the Union that only urine samples will be requested initially, but reserved the right to adjust this procedure in the future, presumably to include blood tests.

**6.** The policy provides that pursuant to a medical evaluation, suspended employees may be offered rehabilitation, the successful completion of which becomes a condition of continued employment. Such employees are thereafter subject to periodic monitoring, and any future positive screen or refusal to screen results in discharge. Employees for whom rehabilitation is not recommended are subject to periodic monitoring and discharge pursuant to any future positive screen or refusal to screen.

**7.** There are also provisions of the policy concerning employees who come forward requesting rehabilitation for a drug or alcohol problem.

putes as to the interpretation of or violation of the application of the terms of the Agreement; as to working conditions; or as to disciplinary actions generally. The arbitration clause is much more narrow. The clause states, in pertinent part, that "[d]isputes only as to the interpretation of or an alleged violation of the application of the terms and provisions of this Agreement, as written," shall be subject to arbitration.

Initially, we must determine whether the parties intended to subject their dispute to the grievance and arbitration provisions of their Agreement. Mobil concedes that the company must bargain to impasse over the implementation of a policy such as the random drug and alcohol testing policy, and that once an employee is disciplined pursuant to it, the policy comes within the "Suspension and Discharge" provision of the Agreement, which in turn invokes the grievance and arbitration process. The parties disagree about whether the "Suspension and Discharge" provision can be interpreted to include the random drug and alcohol testing policy within its scope before its implementation and before any disciplinary actions are taken pursuant to its implementation.[8] There is no question that we are to make this determination. *See Sky Vue*, 759 F.2d at 1094 ("the issue of arbitrability is 'a matter to be determined by the courts on the basis of the contract entered into by the parties'") (*quoting Atkinson v. Sinclair Refining Co.*, 370 U.S. 238, 241, 82 S.Ct. 1318, 1320–21, 8 L.Ed.2d 462 (1962)).

Mobil concedes that an arbitrator will eventually rule upon whether the company may subject Union employees to the random drug and alcohol testing program. Mobil asserts, however, that such a determination may only be made by an arbitrator *after* the policy has been implemented and a union employee has been disciplined pursuant to it. This apparently reflects Mobil's contention that it did not intend the "Suspension and Discipline" clause of the

Agreement to limit management prerogatives with respect to instituting workplace policies of this nature.

The Union, on the other hand, asserts that the clause should be interpreted to include disputes over the implementation of such policies *before* their execution, at least in cases in which implementation will directly and inevitably lead to disciplinary actions being instituted. The Union also points out that it did not intend to permit the company to implement any work rule or regulation of employee conduct, no matter how unreasonable, so long as there was pre-implementation bargaining to impasse.

The "Suspension and Discharge" clause of the Agreement reads, in pertinent part, that "[t]he Company shall have the right to suspend or discharge any employee *for cause* at any time and require him to leave the Refinery." (Emphasis supplied.). The parties agree that an arbitrator will eventually decide whether the random drug and alcohol testing policy is reasonable based upon the "for cause" clause of this section.

There is no question that "a party cannot be required to submit to arbitration any dispute to which he has not agreed so to submit." *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960). *See also RCA Corp. v. Local 241, International Federation of Professional and Technical Engineers, AFL–CIO*, 700 F.2d 921, 923 (3d Cir.1983). However, the Supreme Court has held that we are to read arbitration clauses broadly, *see Warrior & Gulf Navigation Co.*, 363 U.S. at 585, 80 S.Ct. at 1354, and to find disputes arbitrable where "the party seeking arbitration is making a claim which on its face is governed by the contract." *United Steelworkers of America v. American Mfg. Co.*, 363 U.S. 564, 568, 80 S.Ct. 1343, 1346, 4 L.Ed.2d 1403 (1960). Moreover, we are to compel arbitration "unless it may be said with positive assurance that the arbitration clause is not susceptible of an inter-

---

**8.** We reject the Union's suggestion that so-called "side letters" exchanged between the parties with respect to Mobil's 1985 drug and alcohol testing policy became part of the 1990 Agreement. We also reject the Union's argument that the "Witnesseth" or "Recognition" clauses of the Agreement can be invoked to resolve the dispute at bar.

pretation that covers the asserted dispute." *Warrior & Gulf Navigation Co.*, 363 U.S. at 582–83, 80 S.Ct. at 1353. "Doubts should be resolved in favor of coverage." *Id.* Generally, pursuant to section 301, "[d]isputes under a collective bargaining contract with an arbitration clause are presumed to be arbitrable." *Niagara Hooker Employees Union v. Occidental Chemical Corp.*, 935 F.2d 1370, 1375 (2d Cir.1991).

We find that Mobil and the Union intended the "for cause" suspension and discharge provision of their Agreement to be broad enough to encompass disputes as to the implementation of policies such as the random drug and alcohol testing policy at issue here. When the direct result of a policy to be implemented will involve disciplinary actions by the company, when in fact one of the purposes of the policy is to instigate such actions, there is a sufficient nexus between the policy and the "for cause" clause to justify its invocation in the policy's pre-implementation stage. It does not appear to us that, interpreted and limited in this fashion, we are unreasonably imposing upon legitimate and necessary management prerogatives. Furthermore, we feel that this conclusion is bolstered by Mobil's concession that the matter is ultimately arbitrable.[9]

Finally, we are mindful, on the one hand, of the serious consequences attached to disciplinary actions generally, and specifically to those precipitated by random drug and alcohol testing; and, on the other hand, of the need to take steps to ensure that drug or alcohol related impairment does not result in potentially serious workplace accidents. In this respect, we note that the Agreement between the parties includes provisions related to workplace health and safety. When viewed as a whole, therefore, we find additional support for our conclusion that the parties intended to include within the four corners of the Agreement, and thus to subject to arbitration, issues such as random drug and alcohol testing. Moreover, it appears reasonable to find that the "for cause" provision of the "Suspension and Discharge" clause of the Agreement was intended to encompass arbitral scrutiny of prospective company policies the result of which inevitably will reach beyond traditional disciplinary measures into the realm of issues of worker privacy and autonomy.

Having found the dispute arbitrable before implementation of the policy, we now turn to whether we should enjoin implementation pending arbitration.

### B. *Enjoinability*

The Norris–LaGuardia Act provides that we may not issue a preliminary injunction in a case growing out of a labor dispute except in extraordinary circumstances. In tension with this premise, however, is the national labor policy which mandates the "promotion of the peaceful resolution of labor disputes through voluntary arbitration." *Nursing Home & Hospital Union No. 434 v. Sky Vue Terrace, Inc.*, 759 F.2d 1094, 1096 (3d Cir.1985); *see also Boys Markets, Inc. v. Retail Clerk's Union, Local 770*, 398 U.S. 235, 90 S.Ct. 1583 (1970).

Traditionally, courts have held that in order to issue a so-called *Boys Markets* injunction, a district court must find that it is "necessary to prevent conduct that threatens or frustrates the arbitral process agreed to by the parties." *Sky Vue*, 759 F.2d at 1098; *see also Niagara Hooker*

---

**9.** We note that in almost all of the cases in which federal courts have been asked to enjoin the implementation of random drug and alcohol testing programs within the private sector, the parties have agreed that the matter is arbitrable in its pre-implementation stage. These cases have relied upon various provisions of collective bargaining agreements to establish the arbitrability of the controversy, such as health and safety provisions, provisions prescribing maintenance of the status quo, or provisions directly addressing drug and alcohol testing.

At least one case has been brought to our attention in which the parties agreed that a suspension and discharge clause similar to the one under consideration rendered the dispute arbitrable at the pre-implementation stage. *See Oil, Chemical & Atomic Workers International Union, AFL–CIO v. Amoco Oil Co.*, 651 F.Supp. 1, 2 (D.Wyo.1986).

Although these cases have not diverted us from our task of interpreting the Agreement before us, they bolster our conclusion that we have adopted a reasonable interpretation of the Agreement.

*Employees Union v. Occidental Chemical Corp.*, 935 F.2d 1370, 1377 (2d Cir.1991) ("a union may obtain a *status quo* injunction against an employer when the employer's action has the effect of frustrating the arbitral process, or rendering it a 'hollow formality' ") (*quoting Lever Brothers Co. v. International Chemical Workers Union, Local 217*, 554 F.2d 115, 123 (4th Cir. 1976)); *Local Lodge No. 1266 v. Panoramic Corp.*, 668 F.2d 276, 283 (7th Cir. 1981) (injunction must be necessary to "prevent arbitration from being rendered a meaningless ritual"). Additionally, of course, "the injunction must also satisfy the traditional requirements of equity." *Niagara Hooker*, 935 F.2d at 1377.

■ Because federal courts must refrain as much as possible from inquiring into the merits of a labor dispute, a task reserved for the arbitrator, there is widespread agreement that a careful analysis of likelihood of success on the merits is inappropriate. The Third Circuit thus has held "that to meet its burden of showing a probability of success on the merits in the context of a *Boys Markets* injunction, the union need only show that the position it takes is 'sufficiently sound to prevent the arbitration from being a futile endeavor.' " *Sky Vue*, 759 F.2d at 1098 (*quoting Panoramic*, 668 F.2d at 284). *See also Lever Brothers* 554 F.2d at 119–20 (court need only find that the party seeking an injunction has raised a genuine issue concerning breach of contract); *International Brotherhood of Electrical Workers, System Council U–9, AFL–CIO v. Metropolitan Edison Co.*, No. 86–4426, slip op. at 6 (E.D.Pa. Aug. 14, 1986) (1986 WL 376) ("the union must establish that its claim is not frivolous"). Thus, in light of the relaxed standard we

are to apply, we have no doubt that there is sufficient merit to the Union's position here to satisfy this prong of the inquiry.

■ With respect to a showing of irreparable harm, however, we are upon much more difficult ground. In determining whether pre-arbitration implementation of a random drug and alcohol testing program threatens irreparable harm to employees, we face a circuit split on the question, without guidance from the Third Circuit, and thus join a large number of district courts who likewise reach opposite conclusions.[10] Only the Second, Fifth, and Tenth Circuits have reached the issue, the Second and Fifth Circuits viewing the matter as threatening no irreparable harm, and the Tenth holding that there is a threat of irreparable harm.

In addition to disagreeing about the extent and legal cognizability of the types of harm caused by the execution of random drug and alcohol testing programs, courts basically disagree about the legal standard to be applied. For instance, in the view of some courts, there cannot be a finding of irreparable harm unless arbitration will be rendered completely useless in the absence of an injunction, such as where a unilateral decision is made to close a plant. On the other hand, some courts view the presence of basically irremediable injuries, such as the invasion of an employee's privacy interests, as sufficient to frustrate the arbitral process.

The question of the proper legal standard to apply, therefore, becomes to what degree must implementation of an action prior to its arbitration threaten or interfere with its subsequent arbitral disposition to render it enjoinable. The question then

---

**10.** *See, e.g., Communications Workers of America v. U.S. West Communications*, 744 F.Supp. 1031, 1033–34 (D.Colo.1990) (irreparable harm); *Aeronautical Industrial District Lodge 776 v. General Dynamics Corp.*, 738 F.Supp. 1038, 1041 (N.D.Tex.1990) (no irreparable harm); *Association of Chemical Employees v. E.I. DuPont de Nemours & Co., Inc.*, 701 F.Supp. 1282, 1288 (S.D.W.Va.1988) (no irreparable harm); *International Brotherhood of Electrical Workers System Council U–4 v. Florida Power and Light Co.*, 678 F.Supp. 257, 258 (S.D.Fla.1987) (irreparable harm); *International Brotherhood of Electrical* *Workers v. Metropolitan Edison Co.*, No. 86–4426, slip op. at 7–8 (E.D.Pa. Aug. 14, 1986) (1986 WL 376) (irreparable harm); *Oil, Chemical and Atomic Workers International Union v. Amoco Oil Co.*, 651 F.Supp. 1, 5 (D.Wyo.1986) (no irreparable harm); *Stove, Furnace and Applied Appliance Workers' International Union, Local 185, AFL–CIO v. Weyerhaeuser Paper Co.*, 650 F.Supp. 431, 433 (S.D.Ill.1986) (irreparable harm); *International Brotherhood of Electrical Workers, Local 1900 v. Potomac Electric Power Co.*, 634 F.Supp. 642, 644 (D.D.C.1986) (no irreparable harm).

becomes determining what degree of harm is created by imposition of a random drug and alcohol testing program.

The view of the Second Circuit, urged upon us by Mobil, is that in order to get an injunction, the Union must show that implementation would render the arbitral process meaningless, and that "[t]he arbitration process is rendered meaningless only if any arbitral award in favor of the union would substantially fail to undo the harm occasioned by the lack of a status quo injunction." *Niagara Hooker Employees Union v. Occidental Chemical Corp.*, 935 F.2d 1370, 1378 (2d Cir.1991). The court reversed the district court's issuance of a preliminary injunction, rejecting the lower court's finding that because "an arbitrator could not remedy the invasion of privacy inherent in the random testing program, the arbitral process would be 'frustrated'...." *Id.* at 1378–79. Noting that the arbitrator could order reinstatement and backpay, the court rejected allegations that injury to reputation or invasion of privacy constitute irreparable harm in this context. *See id.* at 1379 (noting that injury to reputation is no different in such a case as in any case in which an employee is discharged for cause, and discounting invasion of privacy as factor that might render the arbitral process meaningless). Although sympathetic "to the possibility that employees may be humiliated or stigmatized by having to produce urine and allow it to be tested," the court concluded that "this possibility of harm does not so disable the arbitrator from rendering relief as to justify a status quo injunction." *Id.* at 1379. *See also Local Union No. 733 v. Ingalls Shipbuilding Division, Litton Systems, Inc.*, 906 F.2d 149, 153 (5th Cir. 1990) ("speculative possibility of irreparable harm is not of a magnitude sufficient to conclude that traditional arbitral awards would be rendered meaningless").

The Tenth Circuit, in *Oil, Chemical and Atomic Workers International Union, AFL–CIO, Local 2–286 v. Amoco Oil Co.*, 885 F.2d 697 (10th Cir.1989), held that a district court had not abused its discretion by ruling that an arbitrator could not fashion a remedy that would make whole employees whose privacy interests would be violated and who would suffer stigmatization, embarrassment, frustration and humiliation by the imposition of random drug tests, and that therefore the integrity of the arbitral process was threatened. *See id.* at 707. As to the proper standard to apply, the court stated:

> The frustration-of-arbitration analysis focuses on actions by a party that, although not literally interfering with the arbitral process, will irreparably injure the other party and thereby undermine the arbitration by making it impossible for an arbitrator to award an adequate remedy. *Id.* at 704 n. 11.

In deciding the question, the court was concerned about the possibility of an employee testing positive and being subject to disciplinary measures even though his job performance was unimpaired. The court concluded that this "threatens to invade an employee's privacy by disclosing information about his off-the-job conduct that is unrelated to his performance at work." *Id.* at 707. Additionally, the court was concerned about the effects of the program upon the long-term reputational interests of employees inside and outside the work environment. *See id.* The court concluded that the Supreme Court's decision in *Brotherhood of Locomotive Engineers v. Missouri–Kansas–Texas R. Co.*, 363 U.S. 528, 80 S.Ct. 1326, 4 L.Ed.2d 1379 (1960), "strongly suggests that the courts should use a wide focus in assessing the nature of the threatened injury, as well as adopt a broad view of what constitutes irreparable injury in this context." *Amoco Oil*, 885 F.2d at 709.

We decline to adopt in their entirety either standard. We are not inclined to go quite as far as the Second Circuit in defining the degree to which an action must disable arbitration before it can be enjoined. Nor are we inclined to go quite as far as the Tenth Circuit in recognizing the degree to which random drug testing represents an invasion of the privacy interests of employees in this context. In our view, employer action that would frustrate, or "threaten the integrity of the arbitration

process itself," but that would fall short of completely disabling or vitiating arbitration, might warrant injunctive intervention. *See Niagara Hooker*, 935 F.2d at 1370. However, in the case before us, we find that pre-arbitration implementation of the random drug testing program would not so frustrate subsequent arbitration or threaten its integrity as to justify the extraordinary issuance of an injunction.

This determination, of course, is congruent with our assessment of the privacy interests involved here and the degree to which random drug and alcohol testing might invade those interests. We reject Mobil's argument that there are no privacy interests at stake, leaving that for the arbitrator to decide. However, we do not feel that the potential degree of invasion here is either substantial enough or irremediable enough to warrant our intervention. The fact that the Union is apparently satisfied with the program's procedural elements bolsters our conclusion. Essentially, we are satisfied that an arbitrator's ability *substantially* to undo the harm occasioned by the lack of a status quo injunction should the policy be overturned is sufficient to defeat the Union's prayer for an injunction. *See id.* at 1378 ("The arbitral process is not rendered 'meaningless' ... by the inability of an arbitrator to completely restore the status quo ante or by the existence of some interim damage that is irremediable.").

As a result of our sensitivity to the potential privacy, dignity, and reputational interests involved here, we would be inclined to balance the hardships in favor of the Union were such an inquiry dispositive in this case, which it is not because of our finding with respect to irreparable harm. It seems to us that the potential for harm in this area outweighs Mobil's interest in immediate implementation. This, of course, is not to underestimate the safety concerns that drive the company's desire to implement the program.

Given the arbitrability of this issue, the history of good and productive relations between the parties, and their mutual respect and concern for the feelings of employees who will be subject to random testing, we would hope that they will agree to arbitrate this matter in an expedited fashion so that a determination of the program's legitimacy can be made before an employee is disciplined pursuant to the program. Although we may order expedited arbitration, *see International Chemical Workers Union v. Olin Corp.*, No. 87–5745 (Aug. 3, 1987 N.D.Ill.) (1987 WL 15405), we decline to do so in view of our determination with respect to irreparable harm.

## V. CONCLUSION

Random drug and alcohol testing in the private sector is a difficult and controversial subject upon which we pass no judgment beyond the minimal exploration of the merits necessary to resolve the legal questions before us. Indeed, as explored in this opinion, both the arbitrability and the enjoinability of the dispute we have been asked to adjudicate involve complex and unresolved legal questions about which reasonable people may disagree.

Our disposition of this matter leaves Mobil free to implement its random drug and alcohol testing program and leaves the Union free to proceed through the grievance and arbitration process, hopefully before any worker is disciplined pursuant to the program. Although neither result was reached with compromise in mind, this appears to be a fair and just disposition of the matter.

An appropriate order has been entered.