**BAKERY DRIVERS AND SALESMEN LOCAL 194, IBT, Plaintiff,**

v.

**HARRISON BAKING GROUP, INC., a Delaware Corporation, A Unit of Amerifoods Companies, Inc., and Distribution Consultants, Inc., Defendants.**

Civ. A. No. 94–5757.

United States District Court,
D. New Jersey.

Dec. 6, 1994.

Bennet D. Zurofsky, Jesse H. Strauss, Reitman Parsonnet, Newark, NJ, for plaintiff.

Kevin Kovacs, Lowenstein, Sandler, Kohl, Fisher, Boylan, Raritan, NJ, Rody P. Biggert, Joseph S. Turner, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for defendant Harrison Baking Group, Inc.

## OPINION

LECHNER, District Judge.

This is an action by plaintiff Bakery Drivers and Salesmen Local 194, IBT (the "Union") against defendants Harrison Baking Group, Inc. ("Harrison"), a Unit of Amerifoods Companies, Inc. and Distribution Consultants, Inc. ("DCI") (collectively, the "Defendants"), seeking declaratory and injunctive relief pending the outcome of an arbitration proceeding concerning alleged breaches of a collective bargaining agreement and seeking an order directing expedited arbitration. *See* Verified Complaint, filed 29 November 1994 (the "Complaint"), and Exhibits A through D, ¶ 1. Jurisdiction is alleged pursuant to 29 U.S.C. § 185(a). Complaint, ¶ 2.

On 29 November 1994, the Union filed an Order To Show Cause Seeking Temporary Restraints (the "Order To Show Cause"). The Defendants received notice of the Order To Show Cause approximately ninety minutes before counsel for the Union appeared in court; however, counsel for the Defendants did not receive a copy of the Order To Show Cause, the Complaint and the Moving Brief until he arrived at the courthouse. Accordingly, the Order To Show Cause was denied on 29 November 1994, without prejudice, to give the Defendants an opportunity to respond. A hearing on the Order To Show Cause was rescheduled for 2 December 1994.

The Defendants were instructed to submit opposition by 4:00 o'clock p.m. on 1 December 1994. On 2 December 1994, at 8:00 o'clock a.m., a hearing on the Order To Show Cause (the "Hearing") was held. *See* transcript of the Hearing, dated 2 December 1994 (the "Hearing Tr."). At the conclusion of the Hearing, the parties were told that the inclination was to deny the relief requested, but that in light of the arguments and sub- missions their respective positions would be reconsidered over the weekend. *Id.* at 27.

For the reasons set forth below, the Order To Show Cause seeking injunctive relief is denied; the Union's request for an order directing expedited arbitration is denied.[1]

### Facts

#### A. *The Parties*

The Union is an unincorporated labor organization and the exclusive collective bargaining representative for Harrison's driver-salesmen, drivers, over-the-road drivers, utility men and swingmen employed at the Harrison, New Jersey and Cinnaminson, New Jersey facilities of Harrison. Complaint, ¶ 4.

Harrison is a corporation, incorporated under the laws of the state of Delaware. *Id.*, ¶ 5. Harrison produces and sells baked products. *Id.* DCI is an agent and consultant of Harrison for the purposes of selling Harrison's delivery routes. *Id.*, ¶ 6.

#### B. *Background*

A collective bargaining agreement (the "CBA"), *see* Exhibit A to the Complaint, between the Union and Harrison, expired on 31 October 1994. Eversdyke Cert., ¶ 4. Prior to 1 October 1994, Harrison made a business decision to divest itself of its distribution operations effective 1 November 1994. *Id.* According to Harrison, this decision "was based on economic necessity, a desire to raise capital, modernize the bakery and as a means to increase sales." *Id.*

On or about 1 October 1994, Harrison announced its plan to divest the distribution portion of its business by offering to sell delivery routes to the bargaining unit drivers (the "Union Drivers"). *Id.*, ¶ 5; Complaint, ¶ 12. Under Harrison's plan, Union Drivers who purchased routes would become independent distributors rather than employees. Complaint, ¶ 12. According to the Union, the effect of such plan would be to eliminate

---

**1.** In support of the Order To Show Cause, the Union submitted: Plaintiff's Memorandum of Law in Support of its Application for an Order To Show Cause With Temporary Restraints (the "Moving Brief").

In opposition to the Order To Show Cause, Defendants submitted: Memorandum in Opposi- tion to Plaintiff's Complaint for Injunctive Relief (the "Opp.Brief"); Certification of Marvin Eversdyke (the "Eversdyke Cert."), President of Harrison, dated 1 December 1994, attaching Exhibits A through C; Certification of Rody P. Biggert (the "Biggert Cert."), attorney for Harrison, dated 1 December 1994.

the Union as of 1 November 1994, after the CBA expired. *Id.*

Harrison contends there were initially about forty of the more than one hundred Union Drivers interested in purchasing their routes, but only eight did so by 22 October 1994.[2] Eversdyke Cert., ¶ 8. On 27 October 1994, Harrison sent each Union Driver who had not purchased a route a letter (the "27 October Letter"), *see* Exhibit A to the Eversdyke Cert., summarizing the proposal. Eversdyke Cert., ¶ 9. The 27 October Letter explained to Union Drivers that, among other things, under the proposal they could buy their routes at $40,000.00 less than fair market value, they could buy the truck at less than wholesale cost, they would get complete financing with no cash down payment required and Harrison would guarantee to buy the route back during the first year for any reason at the full purchase price. Exhibit A to the Eversdyke Cert.

At the same time, Harrison advertised the sale of delivery routes to the general public. Eversdyke Cert., ¶ 10. Forty-six third parties purchased delivery routes on or before 1 November 1994. *Id.*

On or about 1 November 1994, Harrison terminated the Union Drivers. *Id.;* Complaint, ¶ 12. The forty-six third party purchasers and the eight former Union Driver's who purchased their routes set out to distribute Harrison's products. Eversdyke Cert., ¶ 11. The Union Drivers, who had not purchased routes, then picketed Harrison's facilities urging the public to boycott Harrison products and urging other Harrison employees not to work. Complaint, ¶ 12. The Union, on behalf of the Union Drivers, sought to convince Harrison to cease efforts to sell the delivery routes and to continue to use Union Drivers to distribute its baked products. *Id.*

At this time, the Union also filed a charge with the National Labor Relations Board (the "NLRB") alleging Harrison had failed to bargain in good faith over its decision to sell the existing delivery routes. Eversdyke Cert., ¶ 12. On 9 November 1994, the NLRB determined (the "9 November NLRB Decision"), *see* Exhibit B to the Eversdyke Cert., that Harrison had decided to sell the delivery routes for legitimate business reasons, that Harrison had no obligation to bargain with the Union and that its actions did not violate the National Labor Relations Act. *Id.;* Eversdyke Cert., ¶ 13. As the 9 November NLRB Decision explained: "[Harrison's] decision involved a complete change in its existing distribution system resulting in a change in the scope and direction of [Harrison's] operation. Under these circumstances a bargaining obligation cannot be established." Exhibit B to the Eversdyke Cert.

According to the Union, their efforts caused a substantial amount of loss to Harrison's business. Complaint, ¶ 12. Harrison contends its losses from the Union's activities amounted to $700,000.00 to $800,000.00 per week.[3] Eversdyke Cert., ¶ 14.

On 11 November 1994, Harrison met with Union representatives in an effort to end the disruptions to its business. *Id.* Harrison offered to pay Union Drivers, who did not want to purchase their routes, $20,000.00 in severance money payable by 30 November 1994. *Id.* The Union rejected this proposal. *Id.* Harrison, believing the proposal was not accurately presented to Union Drivers, sent out a letter, dated 14 November 1994 (the "14 November Letter"), *see* Exhibit C to the Eversdyke Cert., explaining its terms. Eversdyke Cert., ¶ 14. The 14 November Letter explained, among other things, that under the proposal "[a]ll [Union Drivers] ... who do not purchase a route will receive a lump sum payment of $20,000.00 (less withholding taxes) by November 30, 1994. This offer is *not contingent* upon the sale of the routes." Exhibit C to the Eversdyke Cert. (emphasis in original).

---

2. According to Harrison: "By reason and belief, the Union pressured the other [Union] Drivers not to buy their routes in an effort to block Harrison's plans to divest itself of its distribution operation." Eversdyke Cert., ¶ 8.

3. According to Harrison, picketing outside their facilities created an extremely hostile and abusive environment. Eversdyke Cert., ¶ 15. Harrison contends trucks were blocked from making pickups, obscenities were screamed at drivers and they and their families were threatened with physical harm. *Id.* Additionally, Harrison explains it was forced to hire 145 security guards to control the situation. *Id.*

To resolve their dispute, the Union and Harrison entered into a new collective bargaining agreement (the "Agreement"), *see* Exhibit B to the Complaint, which was ratified by the Union on 21 November 1994. Complaint, ¶ 13.

## C. Collective Bargaining Agreements

The Agreement, except as specifically provided, renewed the terms of the CBA. *See* Exhibit B to the Complaint, ¶ 1.

The CBA provides:

### GRIEVANCE AND ARBITRATION PROCEDURE:

(A) The parties agree that they will promptly attempt to adjust all complaints, disputes or grievances arising between them involving questions of interpretation or application of any clause or matter covered by this contract, or any act or conduct or relation between the parties, hereto, directly or indirectly.

Exhibit A, Art. XXII(A). Also, according to the CBA, if the parties are unable to resolve their disputes, "either party shall have the right to refer the matter to arbitration." *Id.*, Art. XXII(B).

An arbitrator from the American Arbitrator Association is authorized to resolve all such disputes. *Id.*, Art. XXII(C). The decision of the arbitrator is binding upon both parties and the CBA "where applicable, shall constitute the basis upon which the decision shall be rendered. [Also] [t]he [a]rbitrator shall have no power to alter, amend, revoke or suspend any of the provisions of [the CBA]." *Id.*, Art. XXII(D), (E). According to the CBA, "[t]he parties further agree that . . . arbitration, shall be the sole and exclusive remedy available to [Harrison] for the adjustment of any and all disputes between [Harrison] and the Union." *Id.*, Art. XXII(G).

The Agreement, which was supposed to resolve the dispute over the sale of delivery routes, provides:

Effective November 22, 1994, Harrison may maintain a maximum of fifteen independent distributor routes which it shall identify at that time. All other routes will be serviced by Harrison bargaining unit employees, and Harrison shall not subcontract the work of the drivers represented by the Union or sell their routes to independent distributors for the duration of this Agreement except as provided as follows: During the first six months of this agreement, Harrison may attempt to sell the routes only to bargaining unit drivers. In the event that such a member decides to purchase his route, he shall become an independent distributor and no longer a member of the bargaining unit. All routes that are independent or become independent, will remain independent and can be sold by the drivers or Harrison.

Exhibit B to the Complaint, ¶ 5

## D. Dispute Between the Parties

In the instant action, the Union alleges Harrison entered into the Agreement "in bad faith and never had any intention of complying with its terms. Instead, Harrison was intending to dupe the Union through a scheme of sham transactions."

Complaint, ¶ 14. According to the Union:

[A]s soon as the . . . Agreement became effective, Harrison, with the assistance of its agent DCI, solicited bargaining unit members who had no intention of becoming independent distributors with a $20,-000.00 cash incentive to be strawmen by purchasing one or more routes and immediately reselling them back to Harrison or to an individual produced by Harrison who was not in the [Union].[4]

*Id.*, ¶ 15.

According to Harrison, on 22 November 1994 and 23 November 1994, it reconfigured the number of delivery routes to forty-six—all that was needed to cover its then existing business. Eversdyke Cert., ¶ 18. On 25 November 1994, Harrison made further efforts to sell the routes to Union Drivers. *Id.*

---

4. As the Union conceded at the Hearing, these "strawmen transactions" at issue "are sales to the members of the [U]nion and repurchases from members of the [U]nion." Hearing Tr. at

12. According to the Union, various members of the Union are, therefore, engaging in the very sales with Harrison that the Union protests in the Order To Show Cause. *Id.* at 12–13.

Harrison contends, that at present all the delivery routes it needs are either independently owned by third parties or have been sold or are committed to be sold to Union Drivers. *Id.*

The Union protested Harrison's alleged plan to circumvent the Agreement's limit on sales of delivery routes by letter to Harrison's president, dated 23 November 1994 (the "23 November Letter"). *See* 23 November Letter, Exhibit C to the Complaint. The 23 November Letter also requested that Harrison agree to expedited labor arbitration procedures of the American Arbitration Association. *Id.* at 2. The 23 November Letter insisted on a response to such request by 29 November 1994. *Id.*

According to Harrison, "there was ... an unnecessary rush to come to this courthouse." Hearing Tr. at 21. The 23 November Letter, dated the day before Thanksgiving, was received by Harrison on Friday, 25 November 1994. *Id.* Counsel for Harrison, Rody P. Biggert, Esq. ("Biggert"), did not receive the 23 November Letter until Monday morning, 28 November 1994, when Harrison forwarded a copy to Biggert by facsimile transmission. Biggert Cert., ¶ 2. This was the first notice of the Union's demand for arbitration given to Biggert. *Id.* Biggert immediately called counsel for the Union, Jesse H. Strauss, Esq. ("Strauss"), who was unavailable, regarding the arbitration demand. *Id.*, ¶ 3. Biggert left a message that he would be in court all day, but would call Strauss the next morning, Tuesday, 29 November 1994. *Id.* Biggert received no return message from Strauss. *Id.* Instead, on Tuesday, 29 November 1994, Biggert was notified that the Union intended to appear in court to request injunctive relief. *Id.*

Asserting that it did not receive a response from Harrison, the Union filed a demand for arbitration with the American Arbitration Association, dated 28 November 1994 (the "28 November Letter"), *see* Exhibit D to the Complaint. It took this action pursuant to the terms of the CBA providing for arbitration of disputes and the Agreement concerning the sale of delivery routes. *Id.*; Complaint, ¶ 18. According to the Union, Harrison has refused its request to delay the alleged "sale and repurchase scheme" of the delivery routes until after resolution of the dispute by arbitration. Complaint, ¶ 19.

The Union contends it will be irreparably harmed unless Harrison is enjoined from breaching the Agreement because: 1) once routes are sold and no longer serviced by Union Drivers, the Union will disappear and there will be no work for Union Drivers; 2) Unions Drivers will lose their jobs and all benefits under the Agreement; 3) the Union will have no bargaining relationship with Harrison despite the Agreement; 4) the longer the routes are in the hands of third parties, the more difficult it will be to "unscramble the mess created by Harrison's breach" and for the arbitrator to provide complete relief; and 5) the Union will suffer damage to its reputation in the industry and to its ability to organize. *Id.*, ¶ 22. The Union further alleges it has no adequate remedy at law and the public interest will suffer if Harrison is permitted to violate the Agreement without arbitrating the issues in dispute. *Id.*, ¶¶ 23–24.

The Union, therefore, seeks a preliminary injunction restraining and enjoining the Defendants

and their officers, agents, servants, representatives, employees, assigns, nominees and attorneys, and all other persons acting in concert or in participation with them pending the decision of an arbitrator and the enforcement or vacation of said award by a court of competent jurisdiction: (a) from selling and simultaneously repurchasing or arranging for the resale of Harrison's delivery routes to and from ... [Union Drivers;] and b) ordering [D]efendants to treat each route repurchased by [Defendants] their officers, agents, servants, representatives, employees, assigns, nominees and attorneys, and all other persons acting in concert or in participation with them as if said route had never been sold and as a route to be serviced by a ... [Union Driver] and c) ordering the [D]efendants to rescind any route sales that may have been consummated to any third party subsequent to 21 November 1994, and to treat such routes as if no sale had been made

and as a route to be serviced by a . . . [Union Driver].

*Id.,* ¶ 25. Also, the Union requests Harrison be ordered to arbitrate the dispute expeditiously and the award of compensatory damages. *Id.,* ¶¶ 26–27.

Harrison argues it has exercised its rights under the Agreement to sell and repurchase delivery routes to "the considerable economic benefit of Union members and not to their irreparable detriment." Opp.Brief at 5. Harrison contends "the parties freely negotiated . . . [the Agreement] which clearly permitted Harrison to execute the legitimate transactions the Union now seeks to have rescinded." *Id.*

Additionally, Harrison contends that even if it breached the Agreement, the extraordinary remedy the Union seeks, prior to arbitration, is inappropriate.[5] *Id.* According to Harrison, "Harrison and its parent corporation are ongoing fully capitalized corporations with no present intent to divest themselves of assets or dissolve. In the unlikely event an arbitrator finds a violation of the Agreement, that arbitrator may order a broad range of remedies to make any injured party whole." [6] *Id.*

*Discussion*

A. *Jurisdiction of Federal Courts to Issue Injunctive Relief in Cases Involving Labor Disputes*

The Norris–LaGuardia Act, 29 U.S.C. §§ 101–115, limits the power of Federal courts to grant injunctive relief in actions concerning labor disputes. The Norris–LaGuardia Act provides: "No court of the United States, . . . shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or

growing out of a labor dispute . . . ." 29 U.S.C. § 101.

"The Supreme Court created a narrow exception to this general prohibition, however, where the involvement of the [F]ederal courts is necessary to further another fundamental [F]ederal labor policy—that of encouraging and promoting the voluntary resolution of labor disputes through arbitration." *Nursing Home & Hosp. Union v. Sky Vue Terrace, Inc.,* 759 F.2d 1094, 1098 (3d Cir. 1985) (citing *Boys Markets, Inc. v. Retail Clerks Union, Local 770,* 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970)).

■ In *Boys Markets,* the Court upheld an order enjoining a strike pending resolution of a dispute which was subject to arbitration under the terms of a collective bargaining agreement. 398 U.S. at 254–55, 90 S.Ct. at 1594–95. The *Boys Markets* exception is a narrow one, "deal[ing] only with the situation in which a collective-bargaining contract contains a mandatory grievance adjustment or arbitration procedure." *Id.* at 253, 90 S.Ct. at 1594; *Buffalo Forge Co. v. United Steelworkers,* 428 U.S. 397, 406–07, 96 S.Ct. 3141, 3147–48, 49 L.Ed.2d 1022 (1976) (affirming denial of injunction because employee strike was not over a dispute "even remotely subject to the arbitration provisions of the [collective bargaining agreement,]" and, therefore, was not within narrow *Boys Markets* exception to Norris–LaGuardia Act).

■ According to the Third Circuit, "a *Boys Markets* injunction is appropriate only where necessary to prevent conduct that threatens or frustrates the arbitral process agreed to by the parties." *Sky Vue,* 759 F.2d at 1098 (citing *United Steelworkers v. Fort Pitt Steel Casting,* 598 F.2d 1273, 1282 (3d Cir.1979)). "Although both *Boys Mar-*

5. Counsel for Harrison explained at the Hearing that the Union seeks more than the maintenance of the status quo prior to arbitration:
   it's especially noteworthy that the [U]nion does not want this [c]ourt simply to issue restraints from here on forward, but they want [the court] to go back, they want the [c]ourt to go back and issue some sort of mandatory injunction to determine what transactions occurred over the last week and to start changing those and rescinding those.

Hearing Tr. at 22.

6. At the Hearing counsel for the Union stated: "[Harrison] makes statements in their answering papers as to [its] solvency. . . . We are not at all certain—they make very conclusory statements. We're not certain how true that is." Hearing Tr. at 7. There was, however, no proffer of evidence to support this contention by the Union.

*kets* and *Buffalo Forge* arose in the context of objectionable union conduct, numerous courts have found that the rationale of those cases is equally applicable to cases where a union seeks to enjoin employer conduct." *Sky Vue*, 759 F.2d at 1098 (citing *Local Lodge No. 1266 v. Panoramic Corp.*, 668 F.2d 276 (7th Cir.1981); *Fort Pitt Steel Casting*, 598 F.2d at 1273; *Drivers, Chauffeurs, Warehousemen and Helpers Teamsters Local Union No. 71 v. Akers Motor Lines, Inc.*, 582 F.2d 1336 (4th Cir.1978), *cert. denied*, 440 U.S. 929, 99 S.Ct. 1266, 59 L.Ed.2d 485 (1979); *Lever Bros. Co. v. International Chemical Workers Union, Local 217*, 554 F.2d 115 (4th Cir.1976)); *see also Independent Oil Workers Union v. Mobil Oil Corp.*, 777 F.Supp. 391, 393 (D.N.J.1991) ("We are ... permitted to enjoin employer actions in order to preserve the status quo in aid of arbitration.").

As the Circuit explained:

> To establish that an order enjoining employer conduct is necessary to ensure that the arbitral process will not be frustrated, the party seeking the injunction must prove not only that the underlying disputes are arbitrable, but that the traditional requirements of injunctive relief—probability of success on the merits, irreparable injury, and a balance of hardships—support the award.

*Sky Vue*, 759 F.2d at 1098; *Boys Markets*, 398 U.S. at 254, 90 S.Ct. at 1594; *Independent Oil*, 777 F.Supp. at 393.

### B. *Arbitrability of the Dispute at Issue*

■ A party is not required to submit a dispute to arbitration unless the party has agreed by contract to do so. *Sky Vue*, 759 F.2d at 1097. "[T]he issue of arbitrability is 'a matter to be determined by the courts on the basis of the contract entered into by the parties.'" *Id.* (quoting *Atkinson v. Sinclair Refining Co.*, 370 U.S. 238, 241, 82 S.Ct. 1318, 1320, 8 L.Ed.2d 462 (1962); *Eberle Tanning Co. v. Section 63L*, 682 F.2d 430, 433 (3d Cir.1982)).

"Because of the strong [F]ederal policy in favor of arbitration, however, '[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" *Id.* (quoting *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582–83, 80 S.Ct. 1347, 1253, 4 L.Ed.2d 1409; *H.C. Lawton, Jr. Inc. v. Truck Drivers, Chauffeurs and Helpers Local Union No. 384*, 755 F.2d 324, 328 (3d Cir.1985)).

■ In the instant case, the dispute arises from the interpretation of paragraph five of the Agreement concerning the sale of Harrison's delivery routes. *See* Exhibit B to the Complaint, ¶ 5. As discussed, the parties have agreed to broad arbitration and grievance procedures which cover "complaints, disputes or grievances arising between [the parties] involving questions of interpretation or application of any clause or matter covered by [the CBA], or any act or conduct or relation between the parties, hereto, directly or indirectly." Exhibit A to the Complaint, Art. XXII(A). Additionally, if the parties are unable to resolve their disputes, "either party shall have the right to refer the matter to arbitration." *Id.*, Art. XXII(B).

Accordingly, the dispute in the instant action is arbitratable. The broad arbitration and grievance procedures agreed to by the parties encompass the dispute over the sale of delivery routes and it cannot "'be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'"[7] *Sky Vue*, 759 F.2d at 1097 ((citation omitted) agreeing that a broad grievance and arbitration clause in a collective bargaining agreement covered a dispute over the meaning of a clause in such agreement where grievance was defined as "'any dispute between the parties involving interpretation or application of any provisions of this [a]greement'");

---

**7.** Harrison does not dispute that the issue of the sale of delivery routes is arbitratable. *See* Opp. Brief at 7 ("Here, the Union's apparent grievance, that Harrison may not sell routes to Union members and repurchase them, is subject to arbitration under the terms of the ... Agreement. ... ... [T]his matter should be left by the [c]ourt for resolution through the normal arbitration procedures negotiated by the parties.").

*Fort Pitt Steel Casting,* 598 F.2d at 1279 (holding it was "beyond dispute" that a collective bargaining agreement's arbitration clause, which stated grievance procedures were to be used with regard to "any request or complaint," covered a "dispute which led to [the employer's] threat to terminate premium payments—whether the [u]nion was obligated to reimburse the [employer] for health and insurance plan contributions made during [a] strike").

### C. Frustration of the Arbitral Process in the Absence of Injunctive Relief

■ The next inquiry is whether in the absence of the relief requested, an arbitrator's award would be nothing more than a " 'hollow formality.' " *Sky Vue,* 759 F.2d at 1098; *Fort Pitt Steel Casting,* 598 F.2d at 1282.

The Union contends if Harrison is not enjoined, the delivery routes and jobs will be in the hands of third parties making it "virtually impossible to recover them." Moving Brief at 7. The Union argues once third parties hold title to the delivery routes, an effective arbitral remedy will be precluded. *Id.* However, based upon the submissions and arguments of counsel, it appears all, or substantially all, of the sales or transfers of the routes at issue have been completed. It does not appear there is any significant future action to be enjoined.

Harrison argues: "Because the arbitral process is not in danger of being frustrated at this juncture, this matter should be left by the [c]ourt for resolution through the normal arbitration procedures negotiated by the parties." Opp.Brief at 7. According to Harrison, "[i]n the unlikely event an arbitrator finds a violation of the Agreement, that arbitrator may order a broad range of remedies to make any injured party whole." *Id.* at 5.

As discussed, Harrison contends its present business needs require only forty-six delivery routes. Eversdyke Cert., ¶ 18. Additionally, Harrison contends that at present all the delivery routes it needs are either independently owned by third parties or have been sold or are committed to be sold to Union Drivers. *Id.* It appears, therefore, that the alleged harm, if any, caused by the sales or transfers of delivery routes has already occurred. It cannot be said, therefore, that absent status quo injunctive relief, an arbitrators award would be rendered meaningless because it appears the remedies available to an arbitrator are unlikely to change in the instant case prior to arbitration. Cf. *Sky Vue,* 759 F.2d at 1098 ("District court, ... properly found that an injunction prohibiting the further distribution of [the employer's] assets was necessary to ensure that an arbitral award in the union's favor was more than a 'hollow formality.' ").

The Union's failure to establish the frustration of the arbitral process makes injunctive relief in this context inappropriate. *Sky Vue,* 759 F.2d at 1098; *Fort Pitt Steel Casting,* 598 F.2d at 1282. Additionally, the Union's requested relief is not warranted because it has failed to establish the traditional requirements for injunctive relief.

### D. Traditional Requirements for Injunctive Relief

The final inquiry is whether the relief requested is appropriate under the traditional requirements for injunctive relief. *Sky Vue,* 759 F.2d at 1098; *Boys Markets,* 398 U.S. at 254, 90 S.Ct. at 1594; *Independent Oil,* 777 F.Supp. at 393.

#### 1. Standard of Review for Preliminary Injunctions

■ The Circuit has established, in the non-labor context, that the decision to issue a preliminary injunction is based upon a review of four factors:

(1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest.

*Gerardi v. Pelullo,* 16 F.3d 1363, 1373 (3d Cir.1994); *see also S & R Corp. v. Jiffy Lube Int'l, Inc.,* 968 F.2d 371, 374 (3d Cir.1992); *Merchant & Evans, Inc. v. Roosevelt Bldg. Prods. Co.,* 963 F.2d 628, 632 (3d Cir.1992);

*Opticians Ass'n of Am. v. Independent Opticians of Am.,* 920 F.2d 187, 191–92 (3d Cir. 1990); *Alessi v. Pennsylvania, Dept. of Pub. Welfare,* 893 F.2d 1444, 1447 (3d Cir.1990); *Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797, 799 (3d Cir.1989); *Fechter v. HMW Indus., Inc.,* 879 F.2d 1111, 1116 (3d Cir.1989); *Apollo Technologies v. Centrosphere Indus.,* 805 F.Supp. 1157, 1191 (D.N.J.1992); *Glenside West Corp. v. Exxon Co., U.S.A.,* 761 F.Supp. 1118, 1132 (D.N.J. 1991); *CPC Int'l, Inc. v. Caribe Food Distribs.,* 731 F.Supp. 660, 664 (D.N.J.1990); *Bascom Food Prods. Corp. v. Reese Finer Foods, Inc.,* 715 F.Supp. 616, 624 (D.N.J. 1989). It appears that in this Circuit a consideration of these factors is equally applicable in a labor context. *See Sky Vue,* 759 F.2d at 1098.

Of these four requirements, the Circuit has placed particular weight on the probability of irreparable harm and the likelihood of success on the merits, stating: " '[W]e cannot sustain a preliminary injunction ordered by the district court where either or both of these prerequisites are absent.' " *Hoxworth v. Blinder, Robinson & Co.,* 903 F.2d 186, 197 (3d Cir.1990) (quoting *In re Arthur Treacher's Franchisee Litigation,* 689 F.2d 1137, 1143 (3d Cir.1982)); *see also Instant Air,* 882 F.2d at 800; *Morton v. Beyer,* 822 F.2d 364, 367 (3d Cir.1987); *Sky Vue,* 759 F.2d at 1098–99; *Freixenet, S.A. v. Admiral Wine & Liquor Co.,* 731 F.2d 148, 151 (3d Cir.1984).

Significantly, the Circuit has repeatedly stated that a "grant of injunctive relief is an extraordinary remedy which should be granted only in limited circumstances." *Frank's GMC Truck Center, Inc. v. General Motors Corp.,* 847 F.2d 100, 102 (3d Cir.1988); *accord Chez Sez III Corp. v. Union,* 945 F.2d 628, 634 (3d Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 1265, 117 L.Ed.2d 493 (1992); *Instant Air,* 882 F.2d at 800; *United States v. Philadelphia,* 644 F.2d 187, 191 n. 1 (3d Cir.1980); *see also Driscoll Potatoes, Inc. v. N.A. Produce Co.,* 765 F.Supp. 174, 176 (D.N.J.1991).

In the labor context, the Seventh Circuit in *Panoramic* observed that according to the Supreme Court

existence of actual or threatened irreparable injury is a prerequisite to an award of injunctive relief from breaches of collective bargaining agreements.... Irreparable injury means not simply any injury resulting from a breach of contract that would not be fully redressed by an arbitral award, but rather injury so irreparable that a decision of the [arbitration] Board in the union['s] favor would be but empty victory.

668 F.2d at 285–86 (citations, quotations and footnote omitted). In the instant case, because the Union is not able to establish irreparable injury, it is not entitled to the injunctive relief it seeks.

2. *Irreparable Injury*

■ In order to demonstrate irreparable injury, the moving party "must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial. The preliminary injunction must be the *only* way of protecting the plaintiff from harm." *Instant Air,* 882 F.2d at 801 (emphasis added) (citing *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982); *Continental Group, Inc. v. Amoco Chemicals Corp.,* 614 F.2d 351, 3569 & n. 9 (3d Cir.1980)).

The Supreme Court, in speaking to the irreparable injury requirement, has stated:

[I]t seems clear that the temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury.... "The key word in this consideration is *irreparable.* Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."

*Sampson v. Murray,* 415 U.S. 61, 90, 94 S.Ct. 937, 953, 39 L.Ed.2d 166 (1974) (emphasis original) (quoting *Virginia Petroleum Jobbers Ass'n v. FPC,* 259 F.2d 921, 925 (D.D.C. 1958); quoted in *Instant Air,* 882 F.2d at 801).

The Circuit has towed a similarly strict line on what constitutes irreparable injury. In *Frank's GMC*, the court stated that "[t]he availability of adequate monetary damages belies a claim of irreparable injury." 847 F.2d at 102; *accord Morton*, 822 F.2d at 372. In *Instant Air*, the court stated: "[W]e have never upheld an injunction where the claimed injury constituted a loss of money or loss capable of recoupment in a proper action at law." 882 F.2d at 801 (quoting *Arthur Treacher's*, 689 F.2d at 1145); *see also Morton*, 822 F.2d at 372 (no injunction to prevent termination of plaintiff's employment despite fact that significant cash flow problems and financial distress could follow).

*Frank's GMC* involved a dispute arising from the obligations of a franchise relationship. Frank's GMC had been a franchisee of General Motors Corp. ("GM") since 1937, and since 1973 had sold a full line of GM trucks. 847 F.2d at 100. In 1986, GM advised Frank's GMC that it had entered into a joint venture with Volvo. *Id.* Pursuant to this venture, GM was no longer going to manufacture or supply parts for its former line of heavy-duty trucks. *Id.* Frank's GMC was directed by GM to cease taking orders for GM heavy-duty trucks and was advised that requests for parts would only be filled on a case-by-case basis. *Id.* Moreover, Frank's GMC was not selected to market or sell the new line of trucks that was to be manufactured jointly by GM and Volvo. *Id.*

Frank's GMC sued GM for damages and for an injunction preventing GM from discontinuing its supply of heavy-duty trucks and parts. *Id.* Frank's GMC asserted that it had lost and would continue to lose significant sales because it could not sell a full line of GM trucks. *Id.* at 102. According to Frank's GMC, this loss of sales would cause a corresponding decrease in service contracts, exacerbating the loss to its service business that had already been caused by GM's failure to supply parts and warranty support. *Id.* All of these facts and results, Frank's GMC claimed, would cause irreparable harm to its ongoing business. *Id.*

The district court granted the injunction in favor of Frank's GMC; the Circuit reversed. The Circuit noted that "what clearly stands out in all of Frank's GMC's arguments is that, absent the ad interim relief provided by the district court, Frank's GMC would stand to lose sales and service customers, and therefore profits." *Id.* The court continued: "Even assuming for purposes of argument that Frank's GMC's assertions are true and that it will in fact suffer substantial lost profits as a result of GM's withdrawal from the heavy-truck market, the harm flowing therefrom is compensable by money damages . . . and cannot satisfy the irreparable injury requirement." *Id.*

A similar result was reached in *Instant Air Freight*, 882 F.2d 797. In that case, Instant Air Freight ("Instant Air") and C.F. Air Freight ("C.F.") entered into a four year contract under which Instant Air would provide air freight handling services for C.F. *Id.* at 798. Handling C.F.'s freight constituted eighty percent of Instant Air's business. *Id.* Before the contract had expired, C.F. informed Instant Air that its Elizabeth, New Jersey terminal would be closed. *Id.* It was through this terminal that all of the C.F. freight handled by Instant Air passed. *Id.*

In seeking a preliminary injunction, Instant Air argued that (1) its business would be completely destroyed, (2) it would be required to lay off most, if not all of its seventy employees and (3) its goodwill and business reputation would be destroyed. *Id.* at 801. In short, Instant Air argued, it would "lose everything it has built over the past two decades." *Id.*

Recognizing that absent an injunction Instant Air would "undoubtedly be forced to shutdown or significantly curtail its operations," the district court granted the injunction. *Id.* at 798–99. On appeal, the Circuit reversed, stating: "The bottom line in this case, as in *Frank's GMC*, centers on the loss of money which Instant [Air] will suffer as a result of the contract termination. Here the money damages which Instant [Air] alleges it is suffering are capable of ascertainment and award at final judgement if Instant [Air] prevails. These money damages will fully compensate Instant [Air] for its losses." *Id.* at 801.

In *Arthur Treacher's*, the plaintiff also argued that it would go out of business without an injunction requiring one of its franchises to pay $200,00.00 in over due royalties. 689 F.2d at 1141. In granting the injunction, the district court reasoned: " 'If Arthur Treacher's ultimately prevails at trial, any award of money damages could hardly compensate it if it is bankrupt and without a franchise system which took years to develop,' " *Id.* (quoting district court). The Circuit rejected this argument and denied the injunction.

Finally, the Circuit has indicated that " '[e]stablishing a risk of irreparable harm is not enough. A plaintiff has the burden of proving a clear showing of immediate irreparable injury.' " *Hoxworth*, 903 F.2d at 205 (quoting *Ecri v. McGraw–Hill, Inc.*, 809 F.2d 223, 225 (3d Cir.1987)).

■ In the present context, the Circuit explained that a union satisfied its burden of showing irreparable harm because

even if the union succeeds at arbitration against [the employer,] it is likely to receive only an award of money damages ... for [the employer's] breach of the collective bargaining agreement. A complete dissolution and distribution of [the employer's] assets prior to the arbitration, however, would render such an award meaningless, essentially frustrate the arbitration process, and effectively allow [the employer] to escape its contractual promise to arbitrate disputes over interpretation of the collective bargaining agreement.

*Sky Vue*, 759 F.2d at 1099.

In the instant case, the Union relies on *Panoramic* to support its allegation of irreparable injury. Moving Brief at 8 ("[T]he instant case is nearly on all fours with *Panoramic* in that both involve the sale of company assets.... The logic of that decision finding irreparable injury applies with equal if not greater force in the instant matter."). The facts of *Panoramic* are, however, distinguishable from the instant action.

In *Panoramic*, a corporation sought to sell off an entire division despite an ongoing collective bargaining agreement with employees who were not guaranteed employment by the purchaser. 668 F.2d at 278. The union sought a status quo injunction to halt the sale prior to arbitration to determine whether a clause in the collective bargaining agreement required the corporation to secure from the purchaser an assumption of the labor agreement. *Id.* at 279. Under these circumstances, the *Panoramic* court, which explained that it followed "the practice of most courts and focus[ed] into a single concept the twin ideas of irreparable injury and frustration of arbitration," held the "sale of the ... [d]ivision, were it not for the preliminary injunction issued by the district court, would have resulted in a frustration of the arbitral process and would have threatened irreparable injury to the [u]nion and its members." *Id.* at 286. The court based its decision on the speculative nature of the relief, assuming the union prevailed in arbitration, against the purchaser. *Id.* at 288.

In the instant case, however, there is no allegation that Harrison is dissolving its assets. It appears that, as Harrison contends: "Harrison and its parent corporation are ongoing fully capitalized corporations with no present intent to divest themselves of assets or dissolve." Opp.Brief at 5. It appears, therefore, Harrison would be able to pay an award, if an arbitrator rules that it breached the Agreement. Moreover, despite the Union's contention at the Hearing that Harrison "purports to be selling its assets in a manner that they claim is final and permanent," *see* Hearing Tr. at 4, such sales would add to the companies balance sheet and, therefore, its ability to pay future damages.

■ As discussed, a status quo injunction does not appear to be necessary to prevent frustration of the arbitration process. Most of the sales and transfers complained of occurred prior to the Union's institution of the Order To Show Cause. Additionally, it appears the injunctive relief sought in the instant case will not merely maintain the status quo, as did the relief in *Panoramic*. *See* 668 F.2d at 279. Instead, the requested relief in the instant case seeks to change the status quo by rescinding previous sales and transfers of routes prior to arbitration. Such preliminary relief is not appropriate, nor is it necessary to preserve the arbitral process. The Union can have its dispute with Harri-

son arbitrated, as provided in the Agreement, and it appears the available remedies will not change in the absence of injunctive relief.

### E. *Expedited Arbitration*

 While the Union has not satisfied the requirements for an award of injunctive relief in this action, this does not impact its request for expedited arbitration. As discussed, it is undisputed that the instant dispute is arbitrable. *See supra* 1175–1176. At the Hearing, counsel for the Union reminded the court that the Union was seeking expedited arbitration, and would "very much appreciate" such relief, even if the injunctive relief it sought was denied. Hearing Tr. at 29.

Harrison has not in its opposition brief, nor at the Hearing, articulated any opposition to the Union's request for expedited arbitration. Moreover, it appears to be in the interest of both parties to resolve their dispute in a timely manner. This does not end the inquiry, however.

While expeditious arbitration may be appropriate, the Union has provided no authority to justify such relief. It appears the decision as to the appropriate manner and speed of arbitration should be left up to the arbitrator. To do otherwise, may intrude upon, disrupt or usurp the function and perhaps effectiveness of the arbitrator and the proceedings. Accordingly, the Union's request for an order directing expedited arbitration is denied.

### *Conclusion*

For the reasons set forth above, the Union's motion for injunctive relief is denied; the Union's request for expedited arbitration is denied.